## BEVERIDGE et al. v. HARPER & TURNER OIL TRUST et al.

No. 25567. July 31, 1934.

Rehearing Denied Sept. 11, 1934.

Harlan Deupree, Municipal Counselor, A. P. Van Meter, Asst. Municipal Counselor, and T. F. Weiss, Special Asst. Municipal Counselor, for plaintiffs in error.

John H. Miley, Richard L. Wagner, Edwards & Robinson, Miley, Hoffman, Williams, France & Johnson, for defendants in error.

Walter Marlin, for protestants J. G. York et al.

BUSBY, J. This case presents another chapter in the record of the constant struggle between individual property owners, who seek to use their property in accordance with the dictates of their own judgment, and municipal governmental authorities, who seek to limit and restrict the use of private property under the police power of the state as delegated to municipalities.

By the provisions of a zoning ordinance enacted by the city council of Oklahoma City, the area embraced within the limits of that city has been classified and divided into two classes with respect to its possible use for development and production of oil and gas. In certain definitely designated portions of the city, exploration for and production of oil and gas is permitted under restrictive regulations. In other portions of the city drilling and production is prohibited. The defendants in error, Harper & Turner Oil Trust et al., are the owners of property situated in an area where drilling is prohibited. In the face of the prohibition contained in the ordinance they assert that they may rightfully develop their property and produce oil and gas therefrom. Throughout the proceedings in this case they have sought official recognition of their asserted right to explore for and produce the coveted substances which lie beneath the surface of the earth.

On February 21, 1934, the defendants in error applied to the acting building superintendent of Oklahoma City for a permit to drill an oil and gas well on the property involved, choosing as a location of the proposed well lot 23 in block 9, Durland addition. The application for permit was denied. From the denial of the application for permit by the acting building superintendent an appeal was taken to the board of adjustment, where, after hearing, the permit was again refused. The property owners, feeling themselves aggrieved by the adverse ruling of the board, appealed to the district court of Oklahoma county, where the cause was tried de novo and judgment was rendered authorizing the well to be drilled and ordering a permit to be issued accordingly.

The case is brought to this court on appeal by J. L. Beveridge, acting building superintendent of Oklahoma City, the city of Oklahoma City, a municipal corporation, and some 500 protesting citizens, taxpayers and property owners. These last-mentioned plaintiffs in error first voiced objection to the proposed extension of oil drilling activities by a protest presented to the board of adjustment in connection with this cause. They have appeared and been represented by

counsel throughout the subsequent proceedings in this case.

It is contended by the defendants in error in support of the judgment and decision of the district court, "that the application of the provisions of the ordinances purporting to prohibit the use of the property in question for drilling a petroleum or gas well at the designated location in block 9 (a) takes their private property without compensation, (b) deprives them of property without due process of law, (c) denies them the equal protection of the law; and also (d) that to grant the permit will not be contrary to the public interest, will result in the spirit of the ordinances being observed and is doing substantial justice, and that its denial will result in unnecessary hardship to them."

In substance, the defendants in error contend that the municipal ordinances prohibiting the use of their property for the production of oil and gas are an unreasonable and unconstitutional and therefore invalid attempt to restrict the right to use their property as they see fit. They assert that, as applied to their property, "the prohibition constitutes an unlawful taking without compensation; that the taking is beyond the limits which can rightfully be sustained as a fair and reasonable exercise of the police power. They say that drilling operations and production can be accomplished at the proposed location with reasonable safety to the lives and property of others, thus rendering any attempted prohibition under the asserted authority of the police power unwarranted and unreasonable.

The defendants in error further assert that drilling and production is permitted on other property similarly situated within the limits of Oklahoma City and that the "use zone," as established by the ordinance of that city, is therefore discriminatory and unreasonable and constitutes an arbitrary interference with their constitutional rights.

It is at once apparent from the foregoing survey of the position taken by the defendants in error that a proper understanding of the various arguments presented requires a preliminary recognition of the character and situation of the property involved and the possible or probable effect that drilling operations and production at the proposed location would have upon this and other property situated within Oklahoma City, bearing in mind at all times that, if in this case producton is permitted in the face of the prohibiting ordinance by the judicial application of rules of law, future production must necessarily follow in other prohibited areas similarly situated.

The record is voluminous. The oral testimony of witnesses is supplemented by plats, maps, and photographs. A detailed analysis of the evidence in this opinion is impractical and unnecessary. A brief and comprehensive survey of the situation presented will enable us to apply the controlling principles of law upon which our decision in this case must rest.

Oklahoma City is a growing municipality with a population as shown by the federal decennial census of 1930 of approximately 185,000 people. South and east of the central portion of the city as determined by the location of the principal business district and situated partly within the city limits is one of the largest producing oil fields in the state. The producing sands of the field are said by those qualified to express their opinion to extend northward beyond the present limits of the developed field and to underlie a large portion of Oklahoma City which is now used for business and residential purposes and in which the development and production of oil and gas is prohibited by municipal ordinance.

The proposed well location of the defendants in error is situated within the potentially productive area. It is approximately 900 feet north of the nearest point where drilling is permitted by terms of the ordinances and about 600 feet north of the point where property owners are by provisions of the ordinance authorized to share in the proceeds of production, the intervening 300 feet being known as the "buffer zone." The particular block in which the defendants in error propose to drill their well (block 9 of Durland addition) is in one of the thickly populated districts of the city. Thirty-six houses are situated in the block. Although the block is almost exclusively used for residential purposes, businesses are authorized in the south portion of the block by provisions of the zoning ordinance, with which we are not specially concerned in this case. However, only two business buildings are situated therein. It is also permissible under the zoning ordinance to use the remainder of the block for apartment houses as well as ordinary residences. In the center of the block where it is proposed the well in question should be drilled there is an open space so that

the well would be approximately 125 feet distant from the nearest house. Other blocks in the neighborhood adjacent to block 9 are quite similar thereto in all essential respects. Many residences are situated thereon and the area as a whole is thickly populated. In many respects block 9 of Durland addition and adjacent territory. is similar to some of the blocks now situated in areas where drilling is permitted. With painstaking care the points of similarity between the property within the drilling territory and the property on which 'the defendants in error propose to drill were developed and established at the trial. We are not so much concerned, however, with individual instances of similarity as with the general picture presented by the record. Viewing the record as a whole and considering the entire situation presented thereby, a general distinction is to be observed in the property lying within the drilling area and that from which drilling is prohibited. As one travels south from block 9 of Durland addition into the present established drilling area, the buildings are of a comparatively cheaper class and of cheaper construction, whereas to the north, northeast, and northwest of block 9 as one gets farther away from the drilling area the residences and buildings gradually become of a better constructed type, until by traveling from six to ten blocks one has merged into territory which may be classed among the best residential districts of the city. Thus there is no sharp and well-defined line of demarcation, but rather a gradual change in the character of property and buildings thereon as one passes farther away from the drilling area.

Bearing in mind the character and situation of the property involved in this action, we now direct our attention to the possible effect that production of oil and gas would have upon this property and the property in the neighborhood in which it is situated.

Historically, in the early stages of development, production of oil and gas in the Oklahoma City field was accompanied by an enormous gas pressure which some times caused operators to lose control of wells. which resulted in the scattering of crude oil over the territory in the neighborhood of the well and in releasing of an enormous quantity of natural gas in the vicinity. Drilling at that time was accompanied by a very potent fire hazard. As the field developed and extended, constant production reduced the gas pressure to a great extent, thus materially lessening the fire hazard.

It cannot, however, truthfully be said or successfully urged that inflammable products such as oil or gas may be produced without a measure of increased fire hazard even though the production be unaccompanied by extremely heavy underground gas pressure. Thus, though the fire hazard which endangers life and property is less now than it was in the previous stages of the field development, it is by no means eliminated and cannot be ignored in connection with the properiety of the municipal legislation under consideration. In connection with the handling of inflammable products, there is also a possibility of human negligence, a factor which claims a degree of consideration, since property rights and personal security should depend as little as possible upon the strained theory that human beings will not commit acts of negligence.

Fire hazard and danger alone is not the only effect that an oil field extension may have upon property. When the possible effects of oil drilling extension are considered one who seeks to foresee the effect thereof must consider oil derricks as possible substitutes for shade trees in residence sections; slush pits as possible substitutes for ornamental fish ponds in the back yards; the rhythmic but somewhat harsh pulsation of a rotary drilling rig as a substitute for the gentle sigh of balmy Oklahoma breezes passing through the foliage of landscaped yards; the odor of escaping gases and flowing crude oil as substitutes for the fragrance of residential rose gardens; oil well appliances and machinery as competitors of the playground apparatus usually provided for the neighborhood children; the rumble of oil field trucks as a substitute for the tinkling bell of the ice cream vendor; and the worry and apprehension that springs from the knowledge of the increased fire hazard, be it great or small, as a substitute for the feeling of security which permeates the household removed from the oil field.

With pictures of the situation as it now exists and the future possible situation that would result from an authorization of the extension of oil drilling activities before us, we direct our attention to the strictly legal aspects of the case.

The right of an individual to use his property as he pleases is a qualified as distinguished from an absolute right. It is at all times circumscribed by the authority of the state under its police power to fairly and reasonably restrict the use of private

property to the end that the public health, welfare, and safety will be promoted and such uses of private property prevented as would injuriously affect the rights of others' in the use and enjoyment of their property. This power is an attribute of sovereignty and rests inherently in the state as a sovereign. Municipal corporations as governmental subdivisions of the state inherently have no portion of that power. If it is possessed by them, their possession must be traced to some delegation of power express or implied by the state.

The municipalities of this state have been specifically clothed with the power to zone by legislative enactment. Sections 6170 to 6179, inclusive, C. O. S. 1921. The proper exercise by municipalities of the police power through zoning ordinances has received the approval of this court. (In re Dawson et al., 136 Okla. 113, 277 P. 226); and of the Supreme Court of the United States (Village of Euclid, Ohio, et al. v. Ambler Realty Company, 272 U. S. 365, 47 Sup. Ct. Rep. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Zahn et al. v. Board of Public Works et al., 274 U. S. 325, 47 Sup. Ct. Rep. 594, 71 L. Ed. 1074). The particular application of this power as a proper means of restricting and regulating the use of private property for production of oil and gas has likewise received the sanction of this court in Anderson-Kerr, Inc., v. Van Meter. et al., 162 Okla. 164, 19 P. (2d) 1068.

The power to restrict the use of urban property in connection with the exploration for production of oil and gas is not limited to mere regulations prescribing the manner in which production may be accomplished. On the contrary, it includes the power to prohibit the use of private property for that purpose when such use is inconsistent with the promotion of the public health, safety, morals, or general welfare of the community. Marblehead Land Company et al. v. City of Los Angeles, 47 Fed. (2d) 528. In determining what shall constitute a proper application of the police power through zoning ordinances, authorities are not limited or restricted to a consideration of the present or existing situation, but may look to the future growth and development of the city. Thus the power to zone is properly exercised with a view to regulating and controlling the future growth and development of a city. Marblehead Land Company et al. v. City of Los Angeles, supra.

All of the well-considered cases, however, recognize that there is a limitation beyond which the power under consideration cannot be applied. Restrictions upon the use of property through an application of the police power constitute a taking without compensation unless we consider that similar restrictions upon neighboring property constitute a measure of compensation. But, even then, such restrictions, though compensated in a manner by similar restrictions on adjoining property, deprive the individual owner of the power to decide the use to which his property shall be devoted. This in itself is a valuable property right. Recognizing these features of the problem involved, courts have carefully guarded their power to review the situation presented by each case for the purpose of determining the reasonableness of each particular application of the power and have repeatedly said that the legislation by which the restrictions are imposed must not be unreasonable or arbitrary, or constitute an unequal exercise of the power. Marblehead Land Co. et al. v. City of Los Angeles, supra; Village of Euclid, Ohio, et al. v. Ambler Realty Co., supra; Anderson-Kerr, Inc., v. Van Meter et al., supra; Pacific Pallisades Ass'n v. City of Huntington Beach et al. (Cal.) 237 P. 538; In re Dawson et al., supra.

It is at once apparent that the test prescribed is broad in its scope and its application to a particular case involves a measure of judicial discretion. However, in applying this discretion, judicial precedent reflects that controlling importance is attached to fundamental principles which aid the courts in arriving at proper conclusions.

While jealously guarding their own authority to review the use of power involved, courts at all times recognize that their review is judicial in its character, and that the application of the police power to a particular situation is in the first instance a problem for the legislative branch of the government, and that when the legislative branch has spoken in a particular case, its expressed judgment on the subject should not be overridden by the judiciary unless the same is unreasonable, arbitrary, or constitutes an unequal exercise of police power. Thus it has been repeatedly said that in doubtful cases the courts will not substitute their judgment for that of legislative branch of the government, and in such cases the legislation will be upheld. In re Dawson, supra; Feraut v. City of Sacramento et al. (Cal.) 269 P. 537; Marblehead Land Co. v. City of

Los Angeles, supra; Village of Euclid, Ohio, et al. v. Ambler Realty Co., supra.

In applying the foregoing principles to the case at bar we must bear in mind the character of the proceedings before us. We are reviewing a decision of the district court rendered in a character of proceedings which has heretofore been classified by this court as equitable in nature, and we are therefore vested with the power and charged with the duty of reviewing the evidence for the purpose of determining whether the decision of that court is contrary to the clear weight of the evidence. Anderson-Kerr, Inc., v. Van Meter et al., supra. Thus the decision rendered in the lower court claims its due share of notice. But at the same time we must at all times remember that proceedings in the district court now being reviewed in this court involve the validity of the provisions of a municipal ordinance. Thus, if it appears from a review of the record that the clear weight of the evidence establishes a doubtful case in matters touching the validity of the ordinance, it must follow that the judgment of the district court declaring provisions of the ordinance invalid must be reversed, since in doubtful cases municipal legislation must be upheld.

After a careful review of the record we are drawn to what we believe is an inevitable conclusion clearly established by the weight of the evidence that, in view of the density of the population in the area involved, the character of the improvements on the property, its proximity to other better improved property, the possible and probable effect of oil development on the area as it is now situated and its probable effect on the future growth and development of the city, the city council of Oklahoma City as a legislative body was vested with the unquestionable right to prohibit oil development in this area. If we were able to view the record as presenting a doubtful case, the legal effect, as we have previously seen, would be the same.

In what we have thus far said we have considered the power of the city to prohibit oil development in the area involved by municipal legislation without respect to the effect upon that power of permitted oil development in other portions of the city. As we have previously said, a general survey of the entire record presents a proper basis of distinction between the drilling and non-drilling areas established by the ordinance, in that there is a gradual improvement in

property as one passes away from the oil drilling area. The municipal legislative council was faced with the problem of determining whether the entire city should be free from legislative prohibition against oil development or a portion preserved from oil field activities. They decided upon the latter course as the wiser. Having decided to prohibit drilling in a portion of the city, they were faced with the difficulty of determining where the line should be drawn. They exercised their judgment in that respect. The line established is necessarily somewhat arbitrary, since a striking or marked difference cannot be expected to exist between property on one side of an established line and that on the other. The fact that in this respect an established line is somewhat arbitrary does not render a zoning ordinance invalid. In re Dawson, supra; Zahn et al. v. Board of Public Works of the City of Los Angles et al. (Cal.) 234 P. 388; Brown v. City of Los Angeles et al. (Cal.) 192 P. 716. Quite possibly the learned trial judge who heard this case or the members of this court, if they were members of the city council and vested with the legislative power to determine, might draw the line in a different place, but as judicial officers we must accept the established line as a definite expression of the legislative judgment, and must uphold that judgment unless it is made to appear clearly unreasonable, arbitrary, or an unequal exercise of power.

Nor do we think that the fact that the property has been included in the drilling area which is in many respects similar to the property of defendant in error militates against the validity of the ordinance. The municipal legislative council may have committed the error of permitting drilling in areas where in the exercise of better legislative judgment it should have been prohibited. Does it follow that, having erred once, it is charged with a legal duty to err again? Obviously we cannot place the stamp of judicial approval on such a doctrine.

Considering a similar contention in the case of In re Dawson, supra, this court said:

"The board may have made a mistake in granting the permit to operate the grocery store in this zone. This did not mean, however, that it was subject to a legal duty to enlarge the field of encroachment and thereby magnify the error. In the language of the eminent New York jurist, 'The question was not whether someone else had been

favored. The question was whether the petitioner had been illegally oppressed'."

In the case of City of Aurora v. Burns et al., 319 Ill. 84, 149 N. E. 784, it was said:

"Zoning necessarily involves a consideration of the community as a whole and a comprehensive view of its needs. An arbitrary creation of districts, without regard to existing conditions or future growth and development, is not a proper exercise of the police power and is not sustainable. No general zoning plan, however, can be inaugurated without incurring complaints of hardship in particular instances. But the individual whose use of his property may be restricted is not the only person to be considered. The great majority, whose enjoyment of their property rights requires the imposition of restrictions upon the uses to which private property may be put, must also be taken into consideration. The exclusion of places of business from residential districts is not a declaration that such places are nuisances, or that they are to be suppressed as such, but it is a part of the general plan by which the city's territory is allotted to different uses in order to prevent, or at least to reduce, the congestion, disorder and dangers which often inhere in unregulated municipal development."

The above statement received the approval of this court in Baxley v. City of Frederick et al., 133 Okla. 84, 271 P. 257.

We, therefore, conclude that the division line as established by the municipal legislation is neither unreasonable, arbitrary, discriminatory, nor an unequal exercise of the police power in such a degree as to render the municipal legislation invalid. Nor does the established line violate the "due process" or "equal protection" clauses of the federal or state Constitutions.

In the foregoing portions of this opinion we have treated the use zone line as established by municipal ordinance from the standpoint of the power and authority of the municipal legislative body to fix the location thereof.

It is urged, however, that even though the line as fixed may be invulnerable when attacked from a constitutional standpoint, the decision of the lower court in granting permission to drill in the prohibited area may be sustained upon the theory that the board of adjustment on hearing and the district court on appeal therefrom are by the provisions of the statutory law and the municipal ordinance vested with the authority to grant exceptions in individual cases upon conditions prescribed by the ordinance.

This involves questions relating to the power and authority of the board of adjustment.

In considering this question it must be remembered that the board of adjustment is an administrative as distinguished from a legislative body. In re Dawson, supra; Anderson-Kerr, Inc., v. Van Meter et al., supra.

By the terms of the statutory grant of power to municipalities the authority to regulate the use of land is specifically vested in the **legislative body** of the city and **not in the administrative board.** Section 6170, supra, provides:

"For the purpose of promoting health, safety, morals, or the general welfare of the community, the legislative body of cities and incorporated villages is hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes." -

By the provisions of the same act the board of adjustment was authorized and its power and authority prescribed. Section 6176, O. S. 1931. Among other powers it was provided:

"To authorize upon appeal in specific cases such variance from the terms of the ordinance as will not be contrary to the public interest, where owing to special conditions a literal enforcement of the provisions of the ordinance will result in unnecessary hardship, and so that the spirit of the ordinance shall be observed and substantial justice done."

Viewed in its broadest sense the quoted language might be interpreted to authorize the board of adjustment to disregard the provisions of the ordinance almost at pleasure. If so interpreted and applied, it would render the act or that portion thereof invalid, since legislative power cannot be delegated to an administrative board.

The sweeping language employed in the statute, which is copied in the ordinance before us, invited an attack upon the validity of the ordinance in the case of In re Dawson, supra. on the theory that it amounted to a delegation of legislative power to an administrative board.

In upholding the ordinance based upon the act we gave the language employed a restric-

tive meaning and held that it did not constitute a delegation of legislative authority to the board of adjustment.

Having sustained the ordinance based upon the legislative act upon that theory, we cannot now give to the language employed a broader meaning and hold that the board of adjustment is in effect a superior legislative body authorized to substitute its judgment for that of the legislative body of the city and extend the drilling area into the portions of the city where drilling is prohibited by municipal ordinance. Nor can the district court, a judicial body, exercise such a power on appeal. Such an authorized extension would be contrary to the spirit of the ordinance, which, according to the terms of the statute, must at all times be observed. As was said by Justice McNeill, speaking for this court in the case of Anderson-Kerr, Inc., v. Van Meter et al.:

"To uphold the board of adjustment in issuing the drilling permit within a non-drilling territory under this record would nullify the ordinance. This the board of adjustment cannot do."

We are not holding that a case could not be presented where a slight variation in the line established by the ordinance might be authorized by the board of adjustment. We are holding that the case presented here does not authorize the variation requested.

We are indebted in this case to counsel on both sides for able briefs in which their respective theories are presented in detail. The briefs, however, are quite voluminous and would completely fill the printed volume in which this opinion appears. Obviously it is impossible for us to treat every legal rule asserted to bear upon the issues involved or to analyze in this opinion the multitude of authorities cited. We have confined our decision to the controlling principles and cited only authorities of controlling weight bearing directly upon the principles applicable.

The judgment of the district court is reversed, with directions to deny the permit.

RILEY, C. J., and SWINDALL, McNEILL, BAYLESS, and WELCH, JJ., concur. CULLISON, V. C. J., and ANDREWS and OSBORN, JJ., absent.