Representative Grover R. CAMPBELL, Assistant Minority Leader of the Oklahoma House of Representatives; Representative Don Weese; Representative Carolyn Coleman; and Representative Joan Greenwood, Members of the Oklahoma House of Representatives, Petitioners,

v.

Jack WHITE, Director of State Finance, and, Claudette Henry, State Treasurer, Respondents.

No. 80770.

Supreme Court of Oklahoma.

June 29, 1993.

Representative Raymond L. Vaughn, Jr., Assistant Minority Leader, Oklahoma House of Representatives, Edmond and Representative Frank W. Davis, Former Minority Leader, Oklahoma House of Representatives, Guthrie, for petitioners.

Neal Leader, Asst. Atty. Gen., Oklahoma City, for respondents.

KAUGER, Justice:

The dispositive issue presented is whether Senate Bill 142 (S.B. 142) and Senate Bill 725 (S.B. 725) (Bills) contain multiple subjects in violation of the Okla. Const. art. 5, § 56.[1] We find that because Senate Bill 142 and Senate Bill 725 contain multiple subjects, they are unconstitutional under art. 5, § 56 which requires special appropriation bills to contain a single subject.

### FACTS

■ In appropriating state monies for fiscal year 1993, the Oklahoma Legislature passed fourteen appropriation bills covering various state functions.[2] On December

---

1. The Okla. Const. art. 5, § 56 provides:

"The general appropriation bill shall embrace nothing but appropriations for the expenses of the executive, legislative, and judicial departments of the State, and for interest on the public debt. The salary of no officer or employee of the State, or any subdivision thereof, shall be increased in such bill, nor shall any appropriation be made therein for any such officer or employee, unless his employment and the amount of his salary, shall have been already provided for by law. All other appropriations shall be made by separate bills, each embracing but one subject."

2. At the Court's request, the State Officials filed a list of the general subjects of the challenged bills. The bills and the general subjects identified are as follows:
S.B. No. 725—Business Regulatory Functions
S.B. No. 142—Cultural Functions
H.B. No. 2425—Law Enforcement Functions
S.B. No. 723—Judicial Functions
H.B. No. 2421—Educational Functions
S.B. No. 726—Public Safety Functions

16, 1992, the petitioners, Representative Grover R. Campbell, Assistant Minority Leader, Representative Don Weese, Representative Carolyn Coleman, and Representative John Greenwood (collectively, Representatives), filed an original action challenging two of the bills. The Representatives assert that S.B. 142 and S.B. 725 contain multiple subjects in violation of the Okla. Const. art. 5, § 56. On February 1, 1993, the State Secretary of Energy, Charles Nesbitt (Nesbitt/intervenor) filed an application to intervene challenging the twelve other bills passed by the 2nd Session of the 43rd Legislature. The intervenor agrees with the Representatives that S.B. 142 and S.B. 725 each contain a multiplicity of subjects. However, he alleges that the remaining bills also encompass multiple subjects and that they, too, are unconstitutional.[3] The State Officials responded on February 9, 1993, in support of the constitutionality of the Bills. They argue that because S.B. 142 and S.B. 725 each encompass a single "function" of state government, the bills are in compliance with the single-subject mandate of art. 5, § 56. Final pleadings were received February 23, 1993.

Senate Bill No. 142 is styled "An Act Relating to State Cultural Entities." The bill contains appropriations for the State Arts Council, the Oklahoma Department of Libraries, the Will Rogers Memorial Commission, the J.M. Davis Memorial Commission, the Oklahoma Historical Society, the Oklahoma Tourism and Recreation Department, and the Oklahoma Education Television Authority. Senate Bill No. 725 contains numerous provisions relating to "State Business Regulatory Agencies." The bill appropriates monies to the following agencies: the Banking Department, the Department of Commerce, the Commission on Consumer Credit, the Department of Labor, the Liquefied Petroleum Gas Board and the Oklahoma Securities Commission.

**SENATE BILL 142 AND SENATE BILL 725 CONTAIN MULTIPLE SUBJECTS. THEY ARE UNCONSTITUTIONAL UNDER ART. 5, § 56 WHICH REQUIRES SPECIAL APPROPRIATION BILLS TO CONTAIN A SINGLE SUBJECT.**

The funding for numerous state agencies and the efficacy of the Legislature's current model for appropriating state funds is challenged by the Representatives and by the intervenor. Their position is that the Bills are unconstitutional *in toto*. This argument is premised on the language of art. 5, § 56 of the Okla. Const. providing that all appropriations, except those found in a general appropriations bill, " ... **shall be made by separate bills, each embracing but one subject.**" (Emphasis provided.)

The State Officials contend that they have accomplished the mandate of art. 5, § 56, that special appropriation bills each contain only a single subject, by instituting a functional appropriation method. Under this method, each state "function" is funded through one special appropriations bill allowing the Legislature to consider the broad spectrum of a function rather than considering each agency individually. The State Officials argue the Bills each contain a single subject; that is, S.B. 142 covers the cultural functions of the State and S.B. 725 encompasses the business regulatory functions of Oklahoma.

H.B. No. 2427—Government Service Functions
H.B. No. 2423—Social Service Functions
H.B. No. 2424—Natural Resource Regulatory Functions
H.B. No. 2422—Finance Functions
S.B. No. 724—Health Services Functions
H.B. No. 2420—General Appropriation Bill
H.B. No. 2426—General Supplement Appropriation Bill
H.B. No. 1977—Prescribing Duties, and Budgetary and Spending Limitations and Caps

3. The right of the Secretary of Energy to intervene has not been challenged. He appeared in the cause at oral argument presented to a Referee of this Court. As a statutory cabinet officer, the intervenor has an interest in the constitutionality of the challenged legislation because the agencies which he supervises are affected by at least one of the bills. The intervention is allowed. However, because of the prospective operation of the instant opinion, we need not address the constitutionality of the additional twelve bills he challenges. See, discussion and accompanying footnotes, pp. 261–262, infra.

■ The Representatives urge us to assume original jurisdiction and to issue a writ of prohibition freezing the .funds appropriated in S.B. 142 and S.B. 725. They insist that the constitutionality of these bills, both of which encompass special appropriations, is of great public concern.[4] We find that the case before us presents one of those *rare* circumstances where this Court should grant a form of declaratory relief. Therefore, we assume original jurisdiction and grant the request in the form of declaratory relief.[5]

## A.

### THE SINGLE SUBJECT RULE.

■ Most state constitutions contain some form of the single-subject rule.[6] Its purpose is to prevent the practice of logrolling—the enactment of legislation through the combination of unpopular causes with popular legislation on an entirely different subject.[7] Not only does the single subject rule prohibit log-rolling, it

also enables the public and the Legislature to understand the scope and effect of pending legislation. Generally, the only notice of pending legislation is a publication of its title.[8]

The Courts which have considered what the State Officials refer to as a functional approach to addressing the requirement that special appropriation legislation contain a single subject, are divided on the efficacy of the method.[9] However, even if we were to adopt a more expansive approach to the application of the single-subject rule of art. 5, § 56, it is unclear that the result hoped for by the State Officials would be accomplished. Apparently, the State Officials' contention is that a functional approach to consideration of the single-subject mandate of art. 5, § 56 would lead to the upholding of more legislation than what they characterize as the "strict approach" applied in *Johnson v. Walters,* 819 P.2d 694, 698 (Okla.1991).[10]

A review of the relevant case law does not support this proposition. Our recent

4. *Johnson v. Walters,* 819 P.2d 694, 696 (Okla.1991); *Phillips v. Oklahoma Tax Comm'n,* 577 P.2d 1278, 1281 (Okla.1978).

5. The application to assume original jurisdiction and petition for writ of prohibition are transformed into a request for declaratory relief. *Ethics Comm'n v. Cullison,* 850 P.2d 1069, 1071 (Okla.1993).

6. *Johnson v. Walters,* see note 4 at 697, supra; Knowles, "Enforcing the One–Subject Rule: The Case for a Subject Veto," 38 Hastings L.Rev. 563, 565 (1987).

7. *Johnson v. Walters,* see note 4, supra; *Bond v. Phelps,* 200 Okla. 70, 191 P.2d 938, 950 (1948).

8. *Stewart v. Oklahoma Tax Comm'n,* 196 Okla. 675, 168 P.2d 125, 128 (1946); *John Deere Plow Co. v. Owens,* 194 Okla. 96, 147 P.2d 149, 152 (1943). The subject expressed in the title of an act limits its scope. *Safeco Ins. Co. v. Sanders,* 803 P.2d 688, 692 (Okla.1990); *Oklahoma City v. Brient,* 189 Okla. 163, 114 P.2d 459–60 (1941).

9. Not all the cases identify the approach as "functional." However, the following cases consider approaches similar to the one suggested by the State Officials. They all refer to the inclusion of broad topics under a single legislative enactment. Jurisdictions rejecting a functional approach: *State v. Leavins,* 599 So.2d 1326, 1334 (Fla.App.1992) (Statute addressing varied subjects relating to environmental resources vi-

olated single-subject provision of Florida Constitution.); *Clinton v. Taylor,* 284 Ark. 238, 681 S.W.2d 338–39 (Ark.1984) (Appropriations for a judicial retirement system and changing a county from one judicial district to another did not constitute bill with unity of subject.).

Jurisdictions appearing to allow a functional approach: *Raven v. Deukmejian,* 52 Cal.3d 336, 276 Cal.Rptr. 326, 332, 801 P.2d 1077, 1083 (1990) (Act with subject of criminal justice reform containing provisions relating to crime victims and abrogating judicial decisions concerning criminal rights upheld.); *Miller v. Bair,* 444 N.W.2d 487, 490 (Iowa 1989) (Legislation did not violate single-subject requirement when common purpose was multifaceted effort to promote economic development. The Iowa court would also allow the Governor to sever a bill into two subjects in order to avoid the single-subject requirement—an approach we rejected in *Johnson v. Walters,* see note 4 at 698, supra.); *Yute Air Alaska, Inc. v. McAlpine,* 698 P.2d 1173, 1180 (1985) (Although the Alaska court expressed concern over the practice of upholding legislation under broad topics, legislation intended to deregulate intrastate air and motor carriers was upheld.); *Miller v. PPG Indus.,* 48 Ohio App.3d 20, 547 N.E.2d 1216–17 (1988) (Statute having common purpose of regulating hazardous waste facilities upheld.).

10. In *Johnson v. Walters,* see note 4, supra, we struck down a budget reconciliation bill in which the provisions were unrelated.

decision in *Johnson v. Walters*, 819 P.2d 694, 698 (Okla.1991) is dispositive of most of the arguments presented. In *Johnson*, we held that under art. 5, § 57 of the Okla. Const., general legislation bills and special appropriation bills are limited to one subject. Section 56 requires that general appropriation bills embrace nothing but appropriations. Here, special appropriation bills are presented—both Bills contain appropriations and general legislative provisions. Significantly, the Bills do not contain severability provisions; and the Oklahoma Constitution does not have a provision which allows the Governor to treat each subject of a multi-subject bill as a separate enactment. Nor does it have any provision authorizing this Court to excise offending provisions and to leave the balance standing.[11] Just as art. 5, § 56 requires that special appropriation bills contain a single subject, art. 5, § 57 mandates "(e)very act of the Legislature shall embrace but one subject ... except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes ...".[12] Except for limited exceptions—none of which apply here— § 57 requires that every act of the Legislature be limited to a solitary subject. The Bills cannot withstand a single-subject challenge under art. 5, § 56 or under art. 5, § 57.

The Representatives and the State Officials all rely upon *Opinion of the Justices*, 512 So.2d 72, 77 (Ala.1987) in support of their respective positions. In *Justices*, the Alabama court found that provisions providing appropriations for elementary and secondary schools, junior and technical colleges, and for colleges and universities all came within the single rubric of "appropriations for public education." However, the court held that appropriations within the same bill for non-state agencies violated Alabama's constitutional restrictions on general appropriation bills. The Alabama court allowed appropriations all relating to a single subject—public education—to stand. It struck the non-related provisions for non-state agencies. The holding in *Justices* is premised on a history of the funding practices of the Alabama Legislature rather than on any detailed one-subject analysis. It is not particularly instructive for our purposes. We must determine, under Oklahoma law, whether S.B. 142 and S.B. 725 violate the Oklahoma constitutional provisions prohibiting multi-subject legislation.

Nor can the State Officials find a great deal of support for their adoption of the functional approach from other jurisdictions. The California Supreme Court appears to consider the functional approach more restrictive than an approach requiring that provisions be reasonably germane to each other.[13] In *Legislature v. Eu*, 54 Cal.3d 492, 286 Cal.Rptr. 283, 294, 816 P.2d 1309, 1320 (1991), the California Supreme Court compared a functional approach to a requirement that all provisions of legislation be germane to each other. In doing so, the California Court wrote:

---

**11.** The prospective application of the instant cause, see discussion pp. 261–262, infra, moots any argument concerning the practical effect of our ruling. In *Rogers v. Excise Bd. of Greer County*, 701 P.2d 754, 761 (Okla.1984), we recognized that although the decision in a cause was necessary because of the possibility of repetition, the granting of relief was denied. In *Rogers*, funding for the sheriff's department had been reduced without authority by the Greer County Excise Board. Although we found that the reduction was unauthorized, we denied relief because of the confusion that would have resulted in trying to adjust a prior fiscal year's budget and because no practical relief could be granted—the sheriff could not hire staff for prior fiscal years. Here, monies appropriated and expended may not be recovered. *City of Oklahoma City v. Oklahoma Tax Comm'n*, 789 P.2d

1287, 1294 (Okla.1990). See also, *Westinghouse Elec. v. Grand River Dam Auth.*, 720 P.2d 713, 720 (Okla.1986).

**12.** The Okla. Const. art. 5, § 57 provides in pertinent part:

"Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes ... Provided, That if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the laws as may not be expressed in the title thereof."

**13.** *Legislature v. Eu*, 54 Cal.3d 492, 286 Cal.Rptr. 283, 294, 816 P.2d 1309, 1320 (1991).

"... Petitioners appear to be confusing germaneness with functional relationship. As we have previously held, the single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship.... It is enough that the various provisions are reasonably related to a common theme or purpose...." (Citations omitted.)

We also recognized in *Black v. Oklahoma Funding Bd.*, 193 Okla. 1, 140 P.2d 740, 743 (1943) that when considering the single subject mandate of art. 5, § 57, that legislation containing provisions which are **germane, relative, and cognate to one another** do not violate the unity-of-subject requirement.[14]

The State Officials appear to share the confusion between functional relationship and germaneness alluded to by the California Court. As our prior cases applying art. 5, § 57 indicate, the most appropriate standard for applying the single-subject rule is germaneness: are the various provisions related to a common theme or purpose? We expressly affirm the viability of this germaneness test for challenges brought under art. 5, § 56. To the degree that "functional relationships" between different provisions may be shown to illustrate a common purpose thus establishing the germaneness of the provisions, it may have some usefulness. Nonetheless, germaneness is the standard.

In *State v. First Nat'l Bank*, 660 P.2d 406, 414–15 (Alaska 1982), the Alaska Supreme Court acknowledged that it has so broadly construed subjects in order to bring them within the single-subject rule of the Alaska Constitution that its actions might be construed as a sanction for legislation embracing "the whole body of the law." At the same time, the Alaska court readily recognized that its continued application of a broad-brush approach to the consideration of the subject of legislation

rested solely upon the doctrine of *stare decisis*. The court observed that were it considering the issue of a single subject for legislation for the first time, it would apply a more narrow test.[15]

## B.

## APPLICATION OF THE SINGLE SUBJECT RULE.

■ Just as the Alaska judiciary feels bound by its prior rulings, so do we. Although the argument was not identified by the Legislature as a functional approach to consideration of the one-subject rule encompassed in art. 5, § 56, we were urged in *Johnson v. Walters*, 819 P.2d 694, 698 (Okla.1991) to accept, as a single-subject, diverse legislation under a heading of "state government." We rejected this proposition because the adoption of an approach which would allow unrelated legislation to be included in a single enactment simply by the skillful drafting of a broad topic would defeat the purpose of the single-subject mandate of art. 5, § 56—to prevent the execution of piggyback legislation by including it within popular bills.[16] Our consideration of the challenged Bills must be measured against the standard of art. 5, § 56 which requires special appropriation bills to contain a single subject. That means if the bill contains multiple provisions, the provisions must reflect a common, closely akin theme or purpose. Although it is not possible to refine this formulation more precisely, it should by now be apparent from a review of our prior cases that neither § 56 nor § 57 supports an expansive reading. The common themes or purposes embodied in legislation must be readily manifest.

■ Neither enactment withstands scrutiny under this standard. Senate Bill 142 is identified as an act relating to state cultural entities. Although a number of its provisions are directed to state agencies whose

14. The Okla. Const. art. 5, § 57, see note 12, supra.

15. The Alaska court expressed the same concerns in *Yute Air Alaska, Inc. v. McAlpine*, see note 9, supra.

16. *Johnson v. Walters*, see note 4, supra; *Bond v. Phelps*, see note 7, supra.

primary objective might be considered cultural development, it contains provisions which cannot be characterized as "cultural." Section 16 of the act reappropriates monies originally designated for the Oklahoma Department of Tourism and Recreation to provide the state match to federal Bureau of Reclamation Fund Program Funds.[17] The bill also provides for reappropriation of funds relating to the development of an industrial airpark economic study.[18] It restricts the closing of state parks,[19] and it provides for the establishment of an intern program for the State Regents for Higher Education.[20] These provisions have no relationship to the subject of cultural entities identified by the State Officials as the single subject of S.B. 142.

■ The heading of S.B. 725 providing that it is "an act relating to state business regulatory agencies" presents a topic almost as broad as the one identified, and disapproved, in *Johnson*—"state govern-

ment." Included within the regulatory scheme are headstart programs and a detailed list of money received for asbestos abatement. A program providing for early education of children and one requiring an accounting of funds received to abate a health hazard, although regulatory in nature, do not fit within the rubric of "state **business** regulatory agencies." They cannot be considered to come under the topic of business as do provisions for the Banking Department and the Commission on Consumer Credit.

Article 5, § 56 requires that special appropriation bills similar to Senate Bills 142 and 725 embrace a single subject. Each of the Bills contain provisions which are unrelated to each other and to their expressed subjects. Because Senate Bill 142 and Senate Bill 725 contain multiple subjects, they are unconstitutional under art. 5, § 56 requiring special appropriation bills to contain a single subject.[21]

**17.** Section 16 of S.B. 142 provides in pertinent part:
"The sum of Five Hundred Thousand Dollars ($500,000.00) originally appropriated to the Oklahoma Department of Tourism and Recreation ... is hereby reappropriated and redesignated for providing the state match to federal Bureau of Reclamation Matching Fund Program funds...."

**18.** Section 17 of S.B. 142 provides in pertinent part:
"The sum of Thirty Thousand Dollars ... made to the Oklahoma Department of Commerce ... for the purpose of an industrial airpark economic development study is hereby reappropriated to the Oklahoma Department of Tourism and Recreation and redesignated for the purpose of matching funds for any grant awarded to South Western Oklahoma Development Authority for the purposes of an industrial airpark economic development study ..."

**19.** Section 20 of S.B. 142 provides in pertinent part:
"Effective July 1, 1992, no additional state parks shall be closed for part of the year without the specific authorization of the Legislature ..."

**20.** Section 23 of S.B. 142 provides:
"The State Regents for Higher Education are authorized to establish an internship program in conjunction with the Department of Tourism and Recreation for students enrolled in an institution of The Oklahoma State System

of Higher Education who are pursuing an Associate or Business Administration degree in the area of tourism management."

**21.** We are not prepared to hold, as the Representatives urge us to do, that the single subject requirement of art. 5, § 56 may only be met by either the enactment of a general appropriations bill containing multiple subjects or by the passage of individual agency special appropriation bills. See, *State Bd. of Ins. v. National Employee Benefit Admin'rs, Inc.*, 786 S.W.2d 106, 109 (Tex. Ct.App.1990) (Although recognizing the premise that two bills might be so related as to constitute a single subject, the Texas Court found that a bill relating to the administration of an insurance plan and to third-party subscription plans contained multiple subjects.). However, we note the implementation of these methods might be the most efficient avenue for avoiding an art. 5, § 56 attack. Both art. 5, § 56, see note 1, supra, and art. 5, § 57, see note 12, supra, provide that general appropriations bills may contain multiple subjects. These constitutional provisions allow for a single bill to fund state government. The Legislature has used general appropriations bills in the past to accomplish this goal. See, general appropriations bills enacted between 1908 and 1953. The title to Senate Bill 277, enacted by the Second Legislature in 1909, demonstrates the function of the general appropriations bill. It provides:
"An Act to provide the necessary expense of state government for the fiscal year ending June 30, 1910 and 1911, and making appropriations therefor from the state treasury of the State of Oklahoma."

## CONCLUSION

■ The Bills appropriate monies to varied State agencies. The funds were available to the agencies as of July 1, 1992. Undoubtedly, the majority of the monies appropriated have been expended; and monies which have been appropriated and disbursed are not recoverable.[22] Although the usual operative date of opinions issued in original actions is the date the opinion is promulgated,[23] we recognize that a mid-year adjustment to agency funds in the face of the current fiscal climate would cause severe disruption to the State agencies involved. Although the Court has attempted to handle the instant cause expeditiously,[24] the Legislature has completed another budget process. We have no desire, in a year in which the State is faced with significant budget constraints, to issue an opinion which would necessitate the calling of a special session. Such a session would be costly and might result in precious resources appropriated to government operations being expended to support the session itself. We may give prospective operation to our announcements when necessary to avoid disruption and to allow a period of adjustment.[25] Logic and the late hour of the challenge require [26] that we give a prospective operation to this opinion. Because we have no desire to disrupt the funding of state agencies, the effective date of the instant pronouncement shall be June 30, 1994.[27]

Much of the Representatives' argument concerning the validity of Senate Bill 142 and Senate Bill 725 involves the lengthy process of enacting legislation, and the time constraints imposed by art. 5, § 26.[28] We are not free to so expand the meaning of constitutional provisions through the post-hoc application of an inconsistent functionality test.[29] To do so would allow the Constitution to be read as permitting that which it was clearly meant to prohibit. The clear language of art. 5, § 56 [30] requires that all special appropriations bills embrace a single subject. Because Senate Bill 142 and Senate Bill 725 contain a multiplicity of provisions unrelated to a common

We note that in *Draper v. State,* 621 P.2d 1142, 1146 (Okla.1980), this Court held that the Legislature need not enact a general appropriations bill to accomplish annual funding of state agencies. In *Draper,* we found H.B. 1140—a bill containing special appropriations to the State Board of Education for the funding of common schools—to be constitutional. The bill in *Draper* contained appropriations to a single state agency, concerning a single subject—the common schools.

22. *City of Oklahoma City v. Oklahoma Tax Comm'n,* see note 11, supra.

23. *Movant to Quash Grand Jury Subpoenas v. Powers,* 839 P.2d 655–56 (Okla.1992).

24. Final pleadings were received February 23, 1993.

25. *Johnson v. Walters,* see note 4 at 699, supra; *General Motors v. Oklahoma County Bd.,* 678 P.2d 233, 238–41 (Okla.1983), *cert. denied,* 466 U.S. 909, 104 S.Ct. 1689, 80 L.Ed.2d 163 (1984).

26. Although the Representatives expressed some concerns about the constitutionality of the process used by the 43rd Legislature during the legislative process, the formal challenge was not filed until December 16, 1992. At that time, the Bills had been law for approximately five months. The Representatives admit that the challenge was delayed in order to avoid making the challenge a political football during the November elections.

27. The State Officials argued that the real parties in interest—heads of State agencies—had not been included in the challenge process, and that the failure to do so was fatal to the Representatives' cause. Because our decision is not effective until the end of the fiscal year, operation of State agencies will not be affected by funding constraints resulting from an adverse ruling. Therefore, we need not address the necessity of naming the heads of the various agencies as parties.

28. The Okla. Const. art. 5, § 26 provides in pertinent part:
    "The Legislature shall meet in regular session at the seat of government at twelve o'clock noon on the first Monday in February of each year and the regular session shall be finally adjourned sine die not later than five o'clock p.m. on the last Friday in May of each year...."

29. *McCurtain County Excise Bd. v. St. Louis–San Francisco Ry. Co.,* 340 P.2d 213, 216 (1959); *Hines v. Winters,* 320 P.2d 1114, 1119 (1957); *State ex rel. Ogden v. Hunt,* 286 P.2d 1088, 1090–91 (1955).

30. The Okla. Const. art. 5, § 56, see note 1, supra.

theme or purpose, they are unconstitutional.

This is the second time in less than two years that this Court has been called upon to determine whether legislatively enacted laws are unconstitutional for violation of the single-subject mandate. In *Johnson v. Walters*, 819 P.2d 694, 669 (Okla.1991), we gave prospective operation to our pronouncement largely because our ruling had not been foreshadowed. Today, we give a prospective effect to our holding to avoid needless disruption to the operation of state agencies. We trust that a third opinion will not be necessary. Our consideration for the practical operations of government should not be understood to be a shield for the continued enactment of unconstitutional laws. Although we are sympathetic with the time constraints the Legislature faces in session, this Court is bound to uphold the Constitution—we are prepared to do so.

**ORIGINAL JURISDICTION ASSUMED; DECLARATORY RELIEF GRANTED; PROSPECTIVE APPLICATION TO JUNE 30, 1994.**

HODGES, C.J., and HARGRAVE and WATT, JJ., concur.

ALMA WILSON, J., concurs specially.

SUMMERS, J., concurs in part and dissents in part.

LAVENDER, V.C.J., and SIMMS and OPALA, JJ., dissent.

ALMA WILSON, Justice, concurring specially:

Since statehood, legislative enactments have been governed by the one-subject rule. The necessity for strict compliance with the one-subject rule is thoroughly ex-

plained in *Johnson v. Walters*, 819 P.2d 694 (Okla.1991). The Legislature may not encumber general or special appropriations bills with multi-subjects. Okla. Const. art. 5, §§ 56 and 57. Our constitution is the basic guide for government under the law and Legislators do not have the luxury to ignore its clear edicts.

OPALA, Justice, with whom LAVENDER, V.C.J., joins, dissenting.

This case is not about judicial responsibility to compel legislative obedience to the single-subject command in Art. 5, § 56, Okl. Const.,[1] but about the extent of *constitutionally permissible* judicial intrusion into the internal management of the legislative department.

The specific issues presented here are: (a) Does a legislator have proper standing to press a challenge to a bill for noncompliance with the § 56 mandate? (b) Must the substantive-law provisions of the challenged appropriations bills be invalidated under the teachings of *Johnson v. Walters*?[2] (c) Does the separation-of-powers doctrine require this court to adopt a standard of review for gauging § 56 conformity that gives due deference to each house of the legislature to allocate subjects within a bill? and (d) Is a § 56 defect cured by the act's inclusion into the next decennial recompilation? I would answer all four questions in the affirmative.

Although standing to challenge an enactment's validity for § 56 nonconformity has not been challenged, I would resolve this issue *sua sponte* for future guidance.[3] My counsel to the court is that a legislator who complains that his/her voting power was impermissibly harmed or impaired by an improper combination of subjects in viola-

---

1. The terms of Art. 5, § 56, Okl. Const., are: "The general appropriation bill shall embrace nothing but appropriations for the expenses of the executive, legislative, and judicial departments of the State, and for interest on the public debt. The salary of no officer or employee of the State, or any subdivision thereof, shall be increased in such bill, nor shall any appropriation be made therein for any such officer or employee, unless his employment and the amount of his salary, shall have

been already provided for by law. *All other appropriations shall be made by separate bills, each embracing but one subject.*" (Emphasis added.)

2. Okl., 819 P.2d 694 (1991).

3. *Standing may be raised at any stage of the judicial process or by the court on its own motion. Matter of Estate of Doan*, Okl., 727 P.2d 574, 576 n. 3 (1986).

tion of § 56 standards has standing to challenge the enactment's validity.

If an appropriations bill clearly violates the § 56 mandate but its *funding provisions* are beyond the scope of review because of the mootness doctrine, I would follow the teachings of *Walters* and invalidate the bill's *substantive-law components*. Today's opinion, which applies the mootness doctrine to *all the provisions* (meaning appropriations as well as substantive-law portions) in both Senate Bill 142 [SB 142][4] and Senate Bill 725 [SB 725][5], falls short of giving the parties a complete remedy to which they are entitled under the court-crafted standard of review.

The court today adopts the *germaneness* test [6]—expressly rejecting the *functionality* approach [7]—for determining a bill's conformity to the § 56 single-subject command. In applying the germaneness test, the court holds that both bills offend the § 56 standard.

I must recede from that part of today's pronouncement which adopts *germaneness* as the sole test for § 56 compliance. Though I join the court's resolve to enforce the single-subject mandate, I would adopt a test that will insulate us from day-to-day entanglement in the political thicket rather than one that saddles the court with the task of micromanaging another department of government. The proper allocation of a bill's content is a managerial prerogative of each house.

My counsel is that both the *germaneness* and *functionality* tests be allowed to coexist side by side. If a bill's conformity to § 56 strictures is "fairly debatable" when gauged by either test, I would abstain from interfering with the legislature's managerial judgment. This approach would allow the contested legislation *to pass constitutional muster under both the functionality and germaneness tests*. It is, in my view, *fairly debatable* whether the various agencies grouped in both of these bills under attack are functionally interlocked in furtherance of a common purpose and whether the subjects are reasonably related to a common theme.

The final issue I would consider today is whether a § 56 defect in combining unrelated subjects is cured by the act's inclusion into the next decennial recompilation. Because each compilation cures *any defect in form* that may taint a bill, I would not allow any legislation to become the target of invalidation for noncompliance with § 56

**4.** SB 142, 2nd Regular Session, 43rd Legislature (Okl.Sess.L.1992, Ch. 333), an act relating to "state cultural entities," contains appropriations for the following state agencies: State Arts Council, Oklahoma Department of Libraries, Will Rogers Memorial Commission, J.M. Davis Memorial Commission, Oklahoma Historical Society, Oklahoma Tourism and Recreation Department, and Oklahoma Educational Television Authority.

**5.** SB 725, 2nd Regular Session, 43rd Legislature (Okl.Sess.L.1992, Ch. 337), an act relating to "state business regulatory agencies," contains appropriations for the following state agencies: Banking Department, Department of Commerce, Commission on Consumer Credit, Oklahoma Horse Racing Commission, State Insurance Department, Department of Labor, Liquefied Petroleum Gas Board, and Oklahoma Securities Commission.

**6.** The *germaneness* test, as elucidated in Legislature of *State of Cal. v. Eu*, 54 Cal.3d 492, 286 Cal.Rptr. 283, 294, 816 P.2d 1309, 1320 (Cal. 1991), is met when all of the parts of a measure are "reasonably germane" to each other and to "the general purpose or object" of the measure.

**7.** The *functionality* approach "contemplates some functional interrelationship or interdependence" of the bill. *Raven v. Deukmejian*, 52 Cal.3d 336, 276 Cal.Rptr. 326, 334, 801 P.2d 1077, 1085 (Cal.1990). This standard requires that the provisions of a bill "effectively interlock in a functional relationship". *Eu, supra* note 6 at 1321. The test is met when the measure is "functionally related in furtherance of a common underlying purpose." *Fair Political Practices Com'n v. Superior Court*, 25 Cal.3d 33, 157 Cal.Rptr. 855, 872, 599 P.2d 46, 63 (1979) (Manuel, J., dissenting).

Before making the *germaneness* test exclusive, *Eu, supra* note 6 at 1321, the California Supreme Court upheld both the *functionality* and *germaneness* tests. *Amador Valley Joint Union High Schl. Dist. v. State Bd. of Equalization*, 22 Cal.3d 208, 149 Cal.Rptr. 239, 248, 583 P.2d 1281, 1290 (1978). There, the court stated that the provisions of the initiative measure satisfied both standards in that the provisions "are both reasonably germane to, and functionally related" to the subject of property tax relief. *Id.*, 149 Cal.Rptr. at 248, 583 P.2d at 1290.

once an act has been carried into the succeeding decennial compilation.

For all of these reasons, I would assume original jurisdiction but deny the petitioners' quest for relief.

# I.

## A LEGISLATOR HAS STANDING WHEN HIS/HER VOTE ON A BILL HAS BEEN DILUTED AS A RESULT OF IMPERMISSIBLY COERCED DECISION-MAKING

### A.

### *The History of Standing*

Standing in the federal-court system owes its origins to an historic practice by the English parliament of "allowing only those opponents of legislative proposals ... or interests [who] were directly and specially affected to be heard." [8] Under this *legislative* procedure an opponent affected by the proposed legislation was said to have *locus standi.*[9] The English *judiciary* adopted these interest-in-legislation criteria and required that the parties have an *interest in the litigation.* American courts did not embrace the doctrine until the early twentieth century.[10]

### B.

### *Federal Standing*

Standing for any party to sue is part and parcel of the larger requirement of "justiciability". Four components of the justiciability doctrine are (1) ripeness, (2) mootness, (3) political question, and (4) standing.[11] If a party can show that he/she passes muster under all of these justiciable factors, then a federal court has subject matter jurisdiction and can address the merits of the case.

Litigants who seek access to federal court for resolution of their dispute face two hurdles in meeting the threshold requirement of standing—"constitutional limitations of federal courts' jurisdiction and prudential limitations on its exercise." [12] The constitutional aspect of standing is "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." [13] "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant [14] ... and that the injury 'fairly can be traced to the chal-

8. Benck, Standing For State And Federal Legislators, 23 Santa Clara L.Rev. 811, 813 (1983) citing J. Vining, Legal Identity 55, 55–56 (1978).

9. *Benck, supra* note 8, at 813 n. 17. Black's defines *locus standi* as "[a] place of standing; standing in court. A right of appearance in a court of justice, or before a legislative body, on a given question." Black's Law Dictionary at 848 (5th Ed.1979).

10. Some conflict exists among scholars about when the concept of "standing" actually came into being. *See* Burger, Standing To Sue in Public Actions: Is It a Constitutional Requirement?, 78 Yale L.J. 816, 818–19 (1969), where the author asserts that *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), was the first application of the standing doctrine. But *cf.,* Note, *Standing To Sue For Members of Congress,* 83 Yale L.J. 1665, 1667–68 (1974). *Benck, supra* note 8 at n. 18, observes that the word "standing" first appeared in a headnote in 1903 in *Davis & Farnum Mfg. Co. v. Los Angeles,* 189 U.S. 207, 23 S.Ct. 498, 47 L.Ed. 778 (1903). Citing *Mississippi & Mo. R.R. v.*

*Ward,* 67 U.S. (2 Black) 485, 17 L.Ed. 311 (1863), he notes that it was generally understood that a person must show injury or damage as a prerequisite to being heard in a federal court.

11. *Benck, supra* note 8 at 811, citing L. Tribe, American Constitutional Law, § 3–9 to 3–17 (1978 & Supp.1981).

12. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

13. *Warth, supra* note 12, 422 U.S. at 498, 95 S.Ct. at 2205; *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976).

14. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), quoting from *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Diamond v. Charles,* 476 U.S. 54, 70, 106 S.Ct. 1697, 1707–08, 90 L.Ed.2d 48 (1986).

lenged action' and 'is likely to be redressed by a favorable decision....' " [15]

The "prudential" aspect of the standing doctrine addresses itself to the self-restraint by which federal courts limit their jurisdiction. Generally, the plaintiff can only assert that his own interests and legal rights have been injured, and not those of third parties.[16] In addition, the plaintiff must show that his asserted injury would not be better addressed "in the representative branches of government," and that his injury falls within the zone of interest protected by the statute or constitutional guarantee upon which his claim is based.[17] Only if these aspects are met will the court balance the prudential considerations in evaluating whether to grant standing.[18]

## C.

### Oklahoma Standing Requirements

Standing in Oklahoma refers to the legal rights of a person to challenge the conduct of another in a judicial forum.[19] *The issue of standing may be raised at any stage and at any time during the judicial process by any party or sua sponte by the court.*[20] This threshold inquiry must reveal that the party has alleged: (1) an actual or threatened injury, i.e. injury in fact; (2) the relief sought would remedy the injury; and (3) the interest sought to be protected is within the zone of interest protected by statute or by the constitution.[21] These interests must not only be "direct, immediate and substantial",[22] but are limited to those people who actually suffered the injury.[23] Because these requirements coincide with the federal requirements, federal jurisprudence construing standing for legislators is instructive.

## D.

### Standing For Legislators

When a member of the law-making assembly initiates legal proceedings *in his representational capacity* as a congressman or a state legislator, he/she holds no elevated status in establishing standing. He/she must meet the same requirements for standing as any other litigant.[24]

In order to satisfy the *constitutional aspect*[25] some type of redressible injury must be alleged. Injuries suffered by legislators fall within three basic categories:[26] (1) diluted vote, (2) usurpation of legislative power, and (3) diminished effectiveness in

**15.** *Valley Forge, supra* note 14, 454 U.S. at 472, 102 S.Ct. at 758, quoting from *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

**16.** *Valley Forge, supra* note 14, 454 U.S. at 474, 102 S.Ct. at 760; *Warth, supra* note 12, 422 U.S. at 500–501, 95 S.Ct. at 2205.

**17.** *Valley Forge, supra* note 14, 454 U.S. at 475, 102 S.Ct. at 760.

**18.** *Id.*

**19.** *State ex rel. Cartwright v. Okl. Tax Com'n,* Okl., 653 P.2d 1230, 1232 (1982); *Matter of Adoption of Baby Boy D.,* Okl., 742 P.2d 1059, 1062 (1987).

**20.** *Doan, supra* note 3 at 576 n. 3.

**21.** *Independent School Dist. No. 9 v. Glass,* Okl., 639 P.2d 1233, 1237 (1982).

**22.** *Underside v. Lathrop,* Okl., 645 P.2d 514, 517 (1982); *Democratic Party of Oklahoma v. Estep,* Okl., 652 P.2d 271, 274 n. 13 (1982); *Doan, supra* note 3 at 576.

**23.** *Independent School Dist. No. 9 v. Glass, supra* note 21 at 1237.

**24.** *Harrington v. Bush,* 553 F.2d 190, 204 (D.C.Cir.1977).

**25.** See *supra* Part I(B). Although Oklahoma courts are not bound by the Art. III "case or controversy" standard, we use the same test for gauging standing. The "constitutional aspect" in the federal courts is the first prong of the standing test relating itself to injury in fact and redressibility. *See supra* notes 14 and 15. The U.S. Supreme Court recognizes that these are implicit policies of the Art. III "case or controversy". See *Valley Forge, supra* note 14, 454 U.S. at 471, 102 S.Ct. at 758. Oklahoma standing requirements are aligned with this first prong—i.e., the *constitutional aspect.* See *Independent School Dist. No. 9, supra* note 21 at 1237, which shows that injury in fact and redressibility is the first prong of the Oklahoma test. I refer to *constitutional aspect* in this manner for simplicity and consistency.

**26.** *Benck, supra* note 8 at 821. One author categorizes the injuries as: (1) standing based upon an injury derivatively suffered by a congressman due to an injury inflicted upon the Congress, (2) standing based upon the congressman's status as a representative of his or her constituents, and (3) standing based upon an injury suffered directly by the congressman.

carrying out legislative duties absent a judicial declaration.

Legislators have, unequivocally, a *"plain, direct and adequate interest in maintaining the effectiveness of their votes."* [27] Any intrusion that works to squelch or infringe upon this core legislative function operates to dilute the constitutional [28] voting equality among legislators. Such an intrusion is a direct injury to a legislator's interest in casting a meaningful vote. [29]

In this case, the legislators assert they have been injured by being forced to vote "up" or "down" legislative bills which offend the § 56 single-subject mandate. Basically they claim that certain subjects were impermissibly combined, leaving them without the opportunity to segregate out the impermissible parts of each bill. Ac-

Dessem, *Congressional Standing to Sue: Whose Vote is This, Anyway?*, 62 Notre Dame L.R. 1, 13 (1986). Another commentator categorizes them as "capacities in which a legislator may bring suits: (1) as an advocate of traditional individual interest that happens to be connected with legislative activities; (2) as a representative of his or her constituents; (3) as an officially designated representative of a legislative body, typically challenging allegedly unlawful executive action; or (4) as a vindicator of his or her alleged personal interest in full exercise of official legislative powers." L. Tribe, *supra* note 11 at § 2–20 (Supp.1988).

**27.** *Coleman v. Miller*, 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939). In *Coleman* twenty state senators from Kansas maintained that the effectiveness of their votes against state ratification of the Child Labor Amendment had been diluted by the voting process. The vote on the proposed amendment resulted in a tie. The lieutenant governor broke the deadlock by casting a vote in favor of the amendment. The senators maintained that the lieutenant governor was not part of the "legislature" under the constitution and therefore could not vote for the proposed amendment. Apart from this issue, the U.S. Supreme Court held that the senators, in having alleged a direct injury to their voting rights, had enough of an interest in the action to give them standing.

**28.** See Art. 5, § 31, Okl. Const., which implicitly provides that every representative shall have one vote. Fractional votes are inconsistent with Art. 5, § 31. *Brown v. State Election Board*, Okl., 369 P.2d 140 (syllabus 8) (1962). Voting equality among legislators is a constitutional command and cannot be intruded upon.

**29.** Other than *Coleman, supra* note 27, which involved state legislators, the U.S. Supreme Court has never addressed standing for U.S. senators or representatives. (1) Several federal courts in recent years have been inundated with legislators claiming to have been injured in their capacity as lawmakers. In *Kennedy v. Sampson*, 511 F.2d 430, 433 (D.C.Cir.1974), a U.S. Senator alleged that the President's use of the 'pocket veto' was illegal and as a result the legislation that the senator voted for did not become law. The court found that by the President not vetoing or signing the bill that was presented to him, the senator's vote was effectively nullified. (2) Other federal cases have been able to establish standing resulting from injuries to legislators' voting rights. *See Risser v. Thompson*, 930 F.2d 549, 550–551 (7th Cir. 1991) (state legislators had standing to challenge the governor's partial veto power); *Clarke v. United States*, 705 F.Supp. 605, 608 (D.D.C.1988) (District of Columbia city councilmen have standing to challenge law that violates their First Amendment right to vote); *Dennis v. Luis*, 741 F.2d 628, 630–31 (3rd Cir.1984) (territorial legislators had standing to challenge a gubernatorial appointment of a government officer on grounds that they were denied the right to confirm the nominee). (3) Several cases in which legislators brought actions have failed to establish an injury. *See Chiles v. Thornburgh*, 865 F.2d 1197, 1205 (11th Cir.1989) (U.S. senator was denied standing because he had not shown that his vote had been diminished by voting for a detention center for aliens that was being operated contrary to the enacted law); *Harrington, supra* note 24 (U.S. representative was denied standing because he could not show that a mere potential vote for impeachment was impaired as a result of the CIA's activities); *Korioth v. Briscoe*, 523 F.2d 1271, 1277–78 (5th Cir.1975) (state legislator denied standing because his complaint alleged no specific voting infringement); *Holtzman v. Schlesinger*, 484 F.2d 1307, 1315 (2nd Cir.1973) (a U.S. representative was denied standing because her vote was not impaired on whether to send military troops to fight in Cambodia).

Some state courts have been confronted with the issue of standing for legislators. *See Zemprelli v. Thornburg*, 73 Pa.Cmwlth. 101, 457 A.2d 1326, 1329 (1983) (state legislators had standing because they alleged they were denied their right to vote to confirm nomination submitted to them by the governor); *Colorado General Assembly v. Lamm*, 700 P.2d 508, 516 (Col.1985) (the general assembly had standing to challenge the governor on the basis that he was exercising a legislative function in violation of the state constitution). Other state courts have found that a legislator has not shown that he has been injured. *See Wilt v. Beal*, 26 Pa.Cmwlth. 298, 363 A.2d 876, 881 (1976); *Posner v. Rockefeller*, 26 N.Y.2d 970, 311 N.Y.S.2d 15, 15, 259 N.E.2d 484, 485 (1970).

cording to these legislators, they were forced to vote for all of the bills' contents in order to secure passage of the parts that benefited their constituency. *Because the last sentence of § 56 mandates that certain subjects be voted on in separate bills, these legislators have an interest in this court determining whether their votes have been diluted.*

To satisfy the *prudential aspects* of the test for standing the legislators must claim: (a) *they, rather than their constituency*, were injured; and (b) they fall within the zone of interest to be protected under statutory or constitutional law.[30]

The legislators assert here that their voting interest has been directly affected and that this interest falls within the zone of interest protected by Art. 5, § 56. Standing is implicit in any legislator's complaint when a bill is challenged for any § 56 miscombination of subjects. Such a complaint will always raise the issue of vote dilution. The burden is on the respondent to deny that it has occurred. Because these legislators have shown that their voting rights are protected by § 56, they fall within the zone of interest to be protected.

## II.

**JUDICIAL ENFORCEMENT OF § 56's SINGLE–SUBJECT COMMAND**

### A.

*The First–Generation Approach— Johnson v. Walters* [31]

The purpose of the last sentence of § 56 [32]—the single-subject mandate—is (a) to prevent legislators from having their vote impermissibly coerced or impaired by being confronted with improper choices and (b) to prevent the legislature from defeating the governor's veto power in the same manner. In either case an elected official may be required to vote in favor of one provision which he disfavors in order to enact provisions which he supports. In both instances, an affirmative vote is the product of *impermissibly coerced decision-making.* Miscombination of subjects often leads to "logrolling" or improper inducement into voting for the lesser of the evils in the bill. The § 56 single-subject mandate was designed to prevent this kind of intimidation to make a bill saleable.

Our jurisprudence teaches that in a pure (general) appropriations bill, agencies with unrelated functions may be included without offending the § 56 single-subject mandate.[33] It is only when substantive-law components are included within an appropriations bill that the § 56 command is implicated. In *Walters* [34] the court became belatedly converted to the concept of rigorously enforcing the § 56 single-subject mandate, announcing *for the first time since statehood* mandatory compliance with the § 56 strictures. In accordance with *Walters*, if a bill fails to pass constitutional "single-subject" muster, the governor must condemn it by the use of an appropriate veto message and return the bill to the legislature.[35] *Walters* expressly overruled *Wiseman v. Oklahoma Board of*

---

**30.** In every case it is imperative that a legislator show that he was injured *qua* legislator and that there is a legally protected right conferred upon him by statute or by the constitution that affords this voting protection. *Risser, supra* note 29 at 550 (legislators rely on the constitutional provision that guarantees a republican form of government); *Clarke, supra* note 29 at 608 (the First Amendment is relied upon); *Dennis, supra* note 29 at 631 (territorial legislators rely on the advice-and-consent clause of the state constitution); *Kennedy, supra* note 29 at 434 (U.S. senator relies on the separation-of-powers doctrine). The District of Columbia Circuit has developed an additional *prudential* requirement called "equitable discretion." *Helms v. Secretary of Treasury*, 721 F.Supp. 1354, 1357–1359 (D.D.C.1989).

**31.** *Supra* note 2.

**32.** For the pertinent text of Art. 5, § 56, Okl. Const., see *supra* note 1.

**33.** Draper v. State, Okl., 621 P.2d 1142, 1146 (1980); *Walters, supra* note 2.

**34.** *Supra* note 2.

**35.** The Governor cannot approve the bill's interrelated substantive law provisions and line item veto the appropriation provisions. Ordinarily, the governor may veto any subset of the provisions in the appropriation portions of a bill, though he is limited to rejecting the substantive law portion as written.

*Corrections,*[36] which gave birth to the rule that the governor must either accept or reject in toto a bill's substantive-law provisions (Art. 6, § 11 veto power)[37] and *confined* his line item veto power solely to the appropriation items (Art. 6, § 12 veto power).[38]

While I joined the court's "Rip Van Winkle conversion", I counseled in *Walters* (a) against overruling *Wiseman's* teaching and (b) against pronouncing that the governor must declare the bill violative of the single-subject command.[39]

## B.

### *Post–Walters Conversion*

The court's pronouncement today allows the substantive-law provisions of SB 142 and SB 725 to survive despite its alleged commitment to *Walters*. To be true to *Walters*, the appropriation provisions of a constitutionally infirm bill may escape the law's sanction because of mootness, but its substantive-law component *can be condemned as violative of § 56*. By applying the mootness doctrine to *both* the appropriations and substantive-law portions of SB 142 and SB 725, the court in effect withholds from the petitioners the very remedy the teachings of *Walters* intended to afford.

## C.

### *The Constitutional Standard For Gauging § 56 Single–Subject Compliance*

In this case we are faced with a new era and a first-impression question on the proper standard for gauging a bill's conformity to the single-subject mandate. I would join the court in enforcing § 56 but by a different test. The court applies a germaneness test as the sole gauge for § 56 conformity to the single-subject mandate. The artificiality of today's test rejecting the tendered functionality approach[40] and adoption of

---

**36.** Okl., 614 P.2d 551 (1980).

**37.** The terms of Art. 6, § 11, Okl. Const., provide in pertinent part:

> Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature, shall, *before it becomes a law,* be presented to the Governor; *if he approve, he shall sign it;* if not, *he shall return it with his objections to the house in which it shall have originated,* who shall enter the objections at large in the Journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill or joint resolution, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and, if approved by two-thirds of the members elected to that house, it shall become a law, notwithstanding the objections of the Governor.... If any bill or resolution shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the Governor. No bill shall become a law after the final adjournment of the Legislature, unless approved by the Governor within fifteen days after such adjournment." (Emphasis added.)

**38.** The terms of Art. 6, § 12, Okl. Const., are:

> "Every bill passed by the Legislature, making appropriations of money embracing distinct items, shall, *before it becomes a law,* be presented to the Governor; if he disapproves the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated, but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a two-thirds vote, according to the rules and limitations prescribed in the preceding section in reference to other bills: Provided, That this section shall not relieve emergency bills of the requirement of the three-fourths vote." (Emphasis added.)

**39.** *Walters, supra* note 2 at 710 (Opala, C.J., concurring in part and dissenting in part). There, I counseled against requiring the governor to give a declaratory judgment upon an act's constitutional validity. In my view if the governor is forced to declare a bill violative of § 56 because of improperly combining subjects, he would first have to seek a judicial declaration of invalidity.

**40.** The affidavit of one legislator explains that the functional appropriation methodology is a budget management tool that enables the legislature (a) to control and manage appropriations by affording an overview of all funding for an entire government function and by setting up priorities within the function and (b) to appro-

the germaneness test for § 56 compliance will ultimately lead to *judicial microman-agement of legislative decision-making* on allocation of subjects among and within the bills to be processed. This strict test places the court in the political position of a *floor manager* charged with directing the legislative components of each bill. In addition, the germaneness approach provides the legislature with little guidance as to what subjects are properly includable within special appropriations bills. I would not put the legislature in a straitjacket by foisting on that department semantical word games.

For these reasons, *I would adopt both the germaneness and functionality approaches.* If the § 56 conformity of subjects within a bill is fairly debatable, the legislature's allocation presents a judgment call and falls within the protection of the managerial prerogative of each house in which the bill arises. In that event, we

should abstain from judicial intervention.[41] The principle, crafted by the U.S. Supreme Court for testing the validity of legislative zoning regulations,[42] requires that courts defer to the policy-making judgment of the zoning boards where unconstitutional invasion of property rights is at issue, if the question is fairly debatable. This standard will shield us from stepping into a political fray to referee disputes between the departments of government or between or among members of different political parties.

## D.

### The Separation–of–Powers Mandate

Judicial invasion into the legislature's managerial prerogative to allocate subjects within a bill offends the separation-of-powers doctrine enjoined on this government by Art. 4, § 1, Okl. Const.[43] No depart-

priate to the various agencies which perform that function. This functional or common-purpose basis for grouping government agencies within an appropriations bill is similar to the test followed by the California Supreme Court in *Amador, supra* note 7. That test "contemplates some functional interrelationship or interdependence" of the bill. *Raven, supra* note 7, 276 Cal.Rptr. at 334, 801 P.2d at 1085.

**41.** The U.S. Supreme Court gave similar deference to an Oklahoma statute challenged under the Due Process Clause of the 14th Amendment. In *Williamson v. Lee Optical Co.,* 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955), the Court reasoned that if a regulation has any "rational relation to that objective" then it is within constitutional bounds. Similar deference was granted by this court in *Kimery v. Public Service Co. of Oklahoma,* Okl., 622 P.2d 1066, 1069 (1981), where we stated "a legislative act is presumed to be constitutional and will be upheld unless it is clearly, palpably and plainly inconsistent with the Constitution." In *Reherman v. Oklahoma Water Resources Bd.,* Okl., 679 P.2d 1296, 1300 (1984), we held that "whenever possible, statutes should be construed so as to uphold their constitutionality." For a like construction, see *Gilbert Cent. Corp. v. State,* Okl., 716 P.2d 654, 658 (1986); *Black v. Ball Janitorial Service, Inc.,* Okl., 730 P.2d 510, 512 (1986). Minnesota similarly applies a "hands off" approach in construing its one-subject rule, except when "the challenged statute embodies the mischief sought to be prevented ... prohibiting the *fraudulent* insertion therein *of matters wholly foreign, and in no way related to or connected with its subject* ..." *Wass v. Anderson,* 312 Minn. 394, 252 N.W.2d 131, 134,

135 (1977) (emphasis mine). One commentator expresses the view that historically courts gave *"judicial deference to the legislature's judgment"* with regard to the one-subject rule. Ruud, *No Law Shall Embrace More Than One Subject, 42 Minn.L.Rev. 389, 448 (1958) (emphasis mine).*

**42.** *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1927); *Zahn v. Board of Public Works,* 274 U.S. 325, 328, 47 S.Ct. 594, 595, 71 L.Ed. 1074 (1927); *Beveridge v. Harper & Turner Oil Trust,* 168 Okl. 609, 35 P.2d 435, 439 (1934) (overruled in part on a different point of law in *Oklahoma City v. Harris,* 191 Okl. 125, 126 P.2d 988, 989 (syllabus 2) (1942). "The statement of the rule in *Zahn* remains viable today: 'The most that can be said [of this zoning ordinance] is that whether that determination was an unreasonable, arbitrary or unequal exercise of power is *fairly debatable.* In such circumstances, the settled rule of this court is that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question.'" *Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 514, 97 S.Ct. 1932, 1943 n. 1, 52 L.Ed.2d 531 (1977) (Stevens, J., concurring in judgment) (quoting from *Zahn, supra,* 274 U.S. at 328, 47 S.Ct. at 595.

**43.** Art. 4, § 1, Okl. Const., which expressly establishes a tripartite division of government functions, is offended whenever one governmental branch is allowed to usurp powers expressly delegated to another. The terms of § 1 are:

ment of government may possess *"directly or indirectly an overruling influence over the others."*[44] Each branch has a right to manage itself free from the intrusion of the others. The fairly-debatable standard of review gives due and proper deference to the legislature's managerial prerogative—a by-product of its constitutional liberty to govern itself. Although each branch of government is not "hermetically sealed from one another", "[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, *even to accomplish desirable objectives, must be resisted."*[45]

Courts should not be drawn into the political process and into interparty disputes on issues of policy unless there is a *clear* constitutional violation.[46] The germaneness test is *neither explicitly nor implicitly mandated by § 56 or by any other constitutional provision;* neither is it a test to which this court has previously committed itself. *The teachings in Rupe v. Shaw*[47] *are consistent with the view I espouse today and vary from that of the court.* I would counsel that if the allocation of subjects within a bill presents a fairly debatable issue, the court should abstain from judicial intervention.

## E.

### Application of the Single–Subject Mandate Should Be Consistent Throughout the Oklahoma Constitution

Legislative bills as well as initiative measures are bound by a similar single-subject mandate.[48] It is my counsel that the court adopt a uniform method, using both the germaneness and functionality tests when examining the single-subject rule under either Art. 5, § 56 or Art. 24, § 1.[49] It is

---

"The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

**44.** *State ex rel. York v. Turpen, Okl.,* 681 P.2d 763, 767 (1984); *Bailey v. State Board of Public Affairs,* 194 Okl. 495, 153 P.2d 235, 239 (1945).

**45.** *I.N.S. v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983) (emphasis mine).

**46.** *Rupe v. Shaw,* Okl., 286 P.2d 1094, 1099 (1955).

**47.** *Supra* note 46.

**48.** The pertinent terms of Art. 24, § 1, Okl. Const., are:
" * * * *No proposal* for the amendment or alteration of this Constitution which is submitted to the voters *shall embrace more than one subject* and the voters shall vote separately for or against each proposal submitted; provided however, that in the submission of proposals for the amendment of this Constitution by articles, which embrace one general subject, each proposed article shall be deemed a single proposal or proposition." (Emphasis mine.)
*In re Initiative Petition No. 348,* Okl., 820 P.2d 772, 776 (1991); *In re Initiative Petition No. 314,* Okl., 625 P.2d 595, 600 (1981), teaches that Art. 24, § 1, Okl. Const., is applicable to initiative petitions. For legislative bills, see Art. 5, § 56, Okl. Const., *supra* note 1, and *Walters, supra* note 2.

**49.** For the text of Art. 5, § 56, Okl. Const., see *supra* note 1; for the text of Art. 24, § 1, Okl. Const., see *supra* note 48. In the past the single-subject rule has been applied inconsistently to initiative measures. In *Rupe, supra* note 46 at 1097, this court "recognized that such constitutional provisions [i.e., Art. 24, § 1] are to receive *a liberal, rather than a narrow or technical construction."* (Emphasis mine.) In *In re Initiative Petition No. 271, State Question No. 408,* Okl., 373 P.2d 1017, 1019 (1962), the court followed *Rupe,* stating that Art. 24, § 1 "is to receive a liberal rather than a narrow or technical construction. It is a cardinal rule that such a restrictive provision shall not be so construed as to hamper and unreasonably restrict legislation." In *In re Initiative Petition No. 314, supra* note 48 at 607, the court examined the dual approach of *Amador, supra* note 7, and found that *Amador* fully supports its single-subject analysis, but opined that courts *"examine the inherent nature of the provisions to determine whether they are subjects which are separate and independent from each other so that each could stand alone, or fall as a whole".* (Emphasis mine.) In *In re Petition No. 319, State Question No. 563,* Okl., 682 P.2d 222, 224 (1984), the court opined that it "can apply to this question no more restrictive test than the one approved in both *Rupe* and in *In re Petition No. 271."* In more recent cases, the court applies the single-subject analysis contained in *In re Petition No. 314, supra* note 48 (see *In re Initiative Petition No. 348, State Question No. 640, supra* note 48 at 776).

only logical that the court should adopt but *one* single-subject rule that would be uniformly applicable to legislative and people-generated lawmaking alike.[50]

In addition, I espouse that a *uniform* fairly debatable standard be adopted in order to keep the court from politically entangling itself in both legislative and initiative measures. In *Rupe* this court cautioned against declaring legislative acts void for noncompliance with the single-subject command.[51]

In *In re Initiative Petition No. 349*,[52] I counseled the court to refrain from invalidating "as-yet-unenacted [initiative] measures in the political process" in order to distance the court from matters of policy. The fairly debatable approach would let the people and the elected lawmakers legislate in a more reasonable way.

## III.

### SB 142 and SB 725 ARE FREE OF CONSTITUTIONAL INFIRMITY

I counsel today that the germaneness and functionality approaches may stand side by side. It is my firm belief that the court should interfere with the content of a bill only in a case of clear noncompliance.

### *It Is Fairly Debatable Whether SB 142 Meets the Functionality and Germaneness Tests*

If it is fairly debatable whether the provisions assigned to a bill are "reasonably related to a common theme or purpose"[53] or "contemplate some functional interrelationship or interdependence",[54] I would allow the legislation to pass constitutional muster. Both SB 142 and SB 725 meet the germaneness and functionality tests, given

the fairly debatable constitutional threshold.

When analyzing whether a bill is germane, courts look to whether "[e]ach of [the measure's] several facets bears a common concern, general object or general subject"[55] or whether the bill is reasonably related to a common theme. SB 142's title indicates that the agencies included in that act are grouped together according to their function as "state cultural entities". The "common concern" or "common theme or purpose" of SB 142 is the appropriation of monies for state cultural activities. It is fairly debatable whether all of the provisions in this legislative initiative do relate to its common theme and are hence germane to one another. Whether for the purpose of tourism and recreation, libraries, arts council, or historical society, all of the subjects are related to appropriating monies for cultural activities. The same can be established for SB 725 in providing for the appropriation of state business regulatory agencies in that all of the provisions are related to the appropriation of monies for agencies which regulate business within the state.

Using a strict germaneness test, the court singles out four sections of SB 142 as offensive to the single-subject mandate: (a) § 16 reappropriates monies from the Oklahoma Department of Tourism and Recreation [Tourism Department]; (b) § 17 reappropriates funds to the Tourism Department from the Department of Commerce which relate to the development of an industrial airpark economic study; (c) § 20 prohibits the closing of state parks without specific authorization of the legislature; and (d) § 23 establishes an internship pro-

**50.** The single-subject mandate is found in both Art. 24, § 1, Okl. Const., *supra* note 48, and Art. 5, § 56, Okl. Const., *supra* note 1.

**51.** *Rupe, supra* note 46 at 1099. For a similar analysis, see *Draper, supra* note 33; *Massey v. Farmers Ins. Group*, Okl., 837 P.2d 880 (1992).

**52.** Okl., 838 P.2d 1, 18–19 (1992) (Opala, C.J., dissenting).

**53.** *Eu, supra* note 6, 286 Cal.Rptr. at 294, 816 P.2d at 1320.

**54.** *Raven, supra* note 7, 276 Cal.Rptr. at 334, 801 P.2d at 1085 (*see Brosnahan v. Brown*, 32 Cal.3d 236, 186 Cal.Rptr. 30, 651 P.2d 274 (Cal.1982)). Even though the California court rejected the more strict approach, I would adopt both approaches to work side by side.

**55.** *Raven, supra* note 7, 276 Cal.Rptr. at 332, 801 P.2d at 1083.

gram for tourism management by the State Regents of Higher Learning in conjunction with the Tourism Department.

My own analysis of these provisions leads me to conclude that they could all meet the *germaneness rule*, if the fairly-debatable standard is applied. This is so because they are related to a common theme or purpose. Section 20, for example, prohibits the Tourism Department from closing state parks for one year effective July 1, 1992, ostensibly because funds have been appropriated for that purpose. It is debatable whether state parks are reasonably related to cultural development and hence the inclusion of § 20 meets the germaneness standard. I would conclude it is fairly debatable whether all of these disputed subjects are reasonably related to this common theme or purpose of appropriating monies for the Tourism Department, and hence to cultural activities.

The functionality test requires that the provisions of a bill "effectively interlock in a functional relationship".[56] The courts look to whether the measure is "functionally related in furtherance of a common underlying purpose."[57] This test determines whether an action or activity is appropriate[58] to further the underlying common purpose. Again, it is fairly debatable whether the action taken by the legislature in allocating the subjects within SB 142 and SB 725 "contemplate some interrelationship or interdependence" and are functionally related in furtherance of a common purpose of appropriating monies to provide for cultural activities or the regulation of business, respectively.[59] For example, as provided for in SB 142, ensuring that the state parks are not closed is functionally related to, or an appropriate action in furtherance of, the underlying purpose of the bill which is providing access to this cultural activity whether it be hiking, boating or camping.

By strictly applying the germaneness test without the fairly debatable test, we arrive at a *reductio ad absurdum:* If these four provisions of SB 142 are nongermane within that bill, they are, for the reasons explained in the footnote, also potentially nongermane to any other legislation.[60] The court's germaneness analysis leaves the legislature without a workable standard to manage its own affairs. This will inevitably place the court in the position of having frequently to revisit these issues and will multiply the number of challenges made to legislative allocations.[61]

**56.** *Eu, supra* note 6, 286 Cal.Rptr. at 295, 816 P.2d at 1321.

**57.** *Amador, supra* note 7, 149 Cal.Rptr. at 248, 583 P.2d at 1290; *Fair Political Practices Com'n, supra* note 7, 157 Cal.Rptr. at 870, 599 P.2d at 63 (Manuel, J., dissenting).

**58.** The term function is derived from Latin "functus", the past participle of the verb "fungor" which means to perform, execute, administer. The nature and proper action of anything. Fulfillment of a definite end or set of ends by the correct adjustment of means. *Black's Law Dictionary,* at 605 (5th Ed.1979).

**59.** *Fair Political Practices Com'n, supra* note 7, 157 Cal.Rptr. at 870, 599 P.2d at 63 (Manuel, J., dissenting).

**60.** For example, § 16 of SB 142 provides for monies originally appropriated to the Department of Tourism and Recreation to be reappropriated to provide for a state match to the federal Bureau of Reclamation Matching Fund Program funds. If this provision were to be placed in the appropriations bill for "natural resource regulatory" functions (HB 2424), it is arguable that because these funds are related to the Tourism Department as originally appropriated they should not be deemed germane to HB 2424. The court's strict application of the germaneness rule leaves the legislature without a workable standard to manage its own affairs. Even worse, this standard, as strictly applied by the court, leaves these provisions without action because they are potentially nongermane to any legislation.

A similar argument could be made about § 23 of SB 142. That section provides for funding for a student tourism internship program. If this provision were to be placed under the State Board of Education appropriations bill, then it could be argued that it would not be germane to the common theme of education because it is an internship for students *pursuing a degree in tourism management* to be ultimately carried out within the Department of Tourism. In my view, under the strict approach this subject would be more appropriately placed under the Department of Tourism and not the State Regents for Higher Education as suggested by the court.

**61.** Without the fairly debatable standard, the arbitrariness of the germaneness standard standing alone leaves the legislature without a workable principle to manage its affairs.

## IV.

### THE CURATIVE EFFECT OF A DECENNIAL RECOMPILATION

Both a defect in title and noncompliance with the single-subject command are *objections to the form of an act* rather than to its substance or content. *Allen v. Retirement System for Justices and Judges*[62] teaches that a bill, defective when passed for want of a good title, becomes impervious to attack after it is carried into the next decennial recompilation. Under the constitutional mandate of Art. 5, § 43, Okl. Const.,[63] the legislature must revise Oklahoma laws every ten years. If the substance of the revision is not otherwise prohibited by the Constitution the revision will stand as authorized.[64] A statute's incorporation in a decennial recompilation purges or cures any defect present in that enactment's title.[65] By relation back the incorporation gives the statute validity from the date of the original enactment in a flawed form.[66]

Any legislation that contains miscombinations of discrete subjects that may be challenged for noncompliance with the § 56 single-subject command under the germaneness standard should be deemed cured with the offending act's inclusion into the next decennial compilation. I would not—under *Allen's* teachings—allow an act to be the target of invalidation for noncompliance if the act had been carried into the 1991 recompilation.

### SUMMARY

A § 56 challenge triggers four threshold issues: (1) whether a legislator has proper standing to press a challenge for noncompliance with the § 56 single-subject command; (2) whether the non-mooted substantive-law provisions of the challenged bill must be invalidated under the teachings of *Walters;* (3) whether a standard of review must be adopted which gauges § 56 conformity with due reference under the separation-of-powers principle to the legislature's power to allocate subjects within a bill; and (4) whether a § 56 defect may be cured by the act's inclusion into the next decennial recompilation.

Standing is a general requirement for any suit. Legislators who complain in this case that their vote has been impaired by the miscombination of subjects in a bill in violation of the single-subject mandate of Art. 5, § 56 have standing to seek relief.

In following the ·teachings of *Walters,* the court can condemn the substantive-law provisions of a constitutionally infirm bill, while the appropriation portions may escape § 56 sanction because of the mootness doctrine. If, as here, an appropriations bill were clearly violative of the § 56 mandate but its *funding provisions* were beyond the scope of review, I would nonetheless invalidate the bill's *substantive-law components.*

The necessity of compelling legislative compliance with Art. 5, § 56 cannot be questioned, but imposing a strict (germaneness) standard for its enforcement would entangle the judiciary in the allocation of subjects within a bill without due deference to another department. What may at first blush appear as a beneficial tool for curb-

**62.** *Allen v. Retirement Sys. For Justices and Judges,* Okl., 769 P.2d 1302, 1305 (1988).

**63.** The terms of Art. 5, § 43, Okl. Const., are: "The Legislature shall, in the year nineteen hundred and nine *and each ten years thereafter,* make provision by law for revising, digesting, and promulgating the statutes of the State." (Emphasis added.)
For the current "recompilation act", see 75 O.S. 1991 §§ 171 et seq.

**64.** *See Allen, supra* note 62 at 1305; *Jamison v. Admiralty Zinc Co.,* 186 Okl. 13, 96 P.2d 26, 28 (1939); *Hines v. Harmon,* 178 Okl. 1, 61 P.2d 641, 644 (1936) (overruled in part on a different point of law in *McConnell v. Goucher,* 188 Okl. 293, 108 P.2d 174, 176 (1940); *Hart v. State,* 59 Okl.Cr. 396, 60 P.2d 411, 412 (1936); *Crowdis v. State,* 59 Okl.Cr. 297, 58 P.2d 154, 156 (1936); *Ex Parte Autry,* 58 Okl.Cr. 88, 50 P.2d 239, 241 (1935).

**65.** *See Bernstein v. Connecticut Fire Insurance Company,* Okl., 315 P.2d 232, 233 (1957); *Bandy v. R.H. Fulton and Company,* Okl., 312 P.2d 875, 879 (1957); *Atchley v. Board of Barber Examiners of State,* 208 Okl. 453, 257 P.2d 302, 305 (1953); *Atlas Life Ins. Co. v. Rose,* 196 Okl. 592, 166 P.2d 1011, 1014 (1946).

**66.** *See Allen, supra* note 62, and cases cited in *supra* note 64.

ing logrolling becomes of secondary significance if viewed as intruding into the preserve of a separate service. The germaneness test alone puts this independence at risk. The level of judicial scrutiny should depend upon the threshold question of whether the allegedly defective bill meets the germaneness or functionality tests. If it is fairly debatable whether it meets either the germaneness or functionality tests, the bill passes § 56 strictures.

I would hold that it is fairly debatable whether SB 142 and SB 725 meet the functionality and germaneness approaches for gauging § 56 conformity. To foist on the legislature a tougher standard would be to invite the court's entry into the political thicket. In a debatable case *a neutral court would stay out of partisan fights.*

Lastly, recompilation cures *any defect in form.* Should a legislator challenge a constitutionally infirm bill after its inclusion in a decennial recompilation, its nonconformity, if any, should be deemed corrected by the act of recompilation.

For all of these reasons I would assume original jurisdiction but deny the writ.

SUMMERS, Justice, Concurring in part and dissenting in part.

I agree with much of the majority opinion, disagreeing only with the form this proceeding should take and the application of the rule of law as correctly identified by the majority.

The petitioners are four legislators who seek a writ of prohibition against the Director of State Finance and the State Treasurer to prevent the disbursement of funds. Prohibition is a remedy to restrain the unauthorized exercise of judicial or quasi-judicial power. *Draper v. State,* 621 P.2d 1142 (Okla.1980). The acts sought to be restrained in this case are not ones occurring in the exercise of judicial or quasi-judicial power. See *Jackson v. Independent School Dist. No. 16,* 648 P.2d 26, 31 n. 20 (Okla.1982) where we defined the term quasi-judicial power. A writ of prohibition is not proper for this controversy.

We have long recognized that a State Treasurer is subject to a writ of mandamus to compel him or her to make disbursements that conform to the law of the State. In *Bryan v. Menefee,* 21 Okla. 1, 95 P. 471 (1908), *State ex rel. Murray v. Carter,* 167 Okla. 473, 30 P.2d 700 (1934) and *Board of Commissioners of Marshall County v. Shaw,* 199 Okla. 66, 182 P.2d 507 (1947) writs of mandamus were held appropriate to compel the State Treasurer to comply with the Okla. Const. Art. V §§ 55 and 56. I would thus recast the petitioners' request for a writ of prohibition as an application for mandamus. *Federal Deposit Insurance Corp. v. Tidwell,* 820 P.2d 1338, 1342 (Okla.1991).

The majority correctly states that the provisions of a bill must be reasonably germane, relative and cognate to each other. *Black v. Oklahoma, a Funding Bd.,* 193 Okla. 1, 140 P.2d 740, 743 (1943). See also *In re Initiative Petition No. 347, State Question No. 639,* 813 P.2d 1019, 1027 (Okla.1991) where the court explained that a different single-subject rule was fulfilled when the text of an act was "germane" to the act's title. My application of the single-subject rule to the case is slightly different than that of the majority.

No single litmus test exists for determining when two provisions are reasonably related or germane to each other. But a review of some of our cases does indicate factors considered by the court. In examining the nature of a "single subject" the court has looked to the effect and purpose of two provisions. In *School Dist. No. 25 of Woods County v. Hodge,* 199 Okla. 81, 183 P.2d 575 (1947) the school act at issue apportioned revenue from motor vehicle registration with 5% to be held in an Oklahoma Tax Commission fund to be ultimately used by the Commission after later appropriation, and 95% was apportioned for the support of common schools. The school act also apportioned revenue from the gross production act. The school act was challenged as violating the single-subject rule because of the two different funding mechanisms and because the funds from one of the revenue sources was to be eventually appropriated to the Tax Commission. *Id.* 183 P.2d at 582. In other

words, it was argued that setting aside money in a fund for the later appropriation to the Tax Commission and also funding common schools were two different subjects as they related to different funding mechanisms.

The Court noted that the money set aside for the Tax Commission was "apportioned" but not appropriated until subsequent enactment. *Id.* The court then stated that "The principal subject of the legislation is the public schools of the state. The apportionment or allocation of certain revenues is merely incidental to the main subject." *Id.* Under this authority provisions are "incidental" and do not violate the single subject rule when they relate in such a way as to implement a common or related purpose. This shows that having two substantive provisions involving (or relating to) different entities of State government does not necessarily violate the single subject rule. They are related to each other in funding a common goal or subject.

In a different context we discussed the single-subject rule for constitutional amendments, and noted that it was designed, in part, to prevent "log-rolling", and that in applying the rule courts would examine the "purposes" behind the amendments and determine if they were connected. *In re Initiative Petition No. 314,* 625 P.2d 595, 602–603 (Okla.1981). Therein we also discussed a "rational relationship" test as examining whether separate provisions (1) possessed a quality of "interdependence" or "an interlocking package", or (2) if one provision was subordinate to another, or (3) if the challenged provisions were "incidental", "supplemental" or an "administrative detail" appended to a single legislative subject. *Id.* 625 P.2d at 607. My application of this authority leads to a somewhat different result than the majority.

### Senate Bill 142

The parties state that S.B. 142 contains appropriations for the State Arts Council,

the Oklahoma Department of Libraries, the Will Rogers Memorial Commission, the J.M. Davis Memorial Commission, the Oklahoma Historical Society, the Oklahoma Tourism and Recreation Department, and the Oklahoma Education Television Authority. In S.B. 142 [1] the Legislature has identified those agencies as ones that share a common purpose for State government, that purpose being a cultural one. The question presented by the parties is whether the Legislature may group in one bill those State entities with a common purpose and fund them as a group. My answer to that question is yes, when there is a reasonable relation between the agencies to be funded so that a single subject is the object of the legislation.

Obviously, "state government" is not a single subject sufficiently narrow in scope. *Johnson v. Walters,* 819 P.2d 694, 698 (Okla.1991). At the other end of the spectrum, and equally obvious, funding for a single state agency is sufficiently narrow. *Draper v. State,* 621 P.2d 1142, 1146 (Okla.1980). In between is such a bill containing appropriations for "cultural" activities of the State. I am of the opinion that this is a single subject when reasonably applied by the Legislature.

The Will Rogers Memorial Commission, the J.M. Davis Memorial Commission, the Oklahoma Department of Libraries, and the Oklahoma Historical Society all clearly involve a common purpose for the funding of state operated museums and libraries and related activities. The Will Rogers Memorial Commission supervises the Will Rogers Memorial, grounds and buildings, and research library. 53 O.S.1991 §§ 45–47.7.[2] The J.M. Davis Memorial Commission is given the duty to preserve certain historic artifacts and provide a place for their viewing. 53 O.S.1991 §§ 201–209. The Oklahoma Historical Society manages museums such as the Cherokee Strip Muse-

---

**1.** Senate Bill 142 is located at Okla.Sess.Laws 1992, Ch. 333, 1577–1585.

**2.** Prior to management by the Commission the property was managed by the Oklahoma Tour-

ism and Recreation Commission. 74 O.S.1991 § 1837. (Editorially recodified from § 1832 to prevent duplication in numbering).

um and Henry S. Johnston Library. 53 O.S.1991 § 4.2. The provisions for the Oklahoma Department of Libraries is located in Title 65 "Public Libraries" and provides the library for state government except those provided by "institutions of higher learning, museums and the Oklahoma Historical Society". 65 O.S.1991 § 3–102.

The Oklahoma Arts Council is perceived as fulfilling a similar purpose, as it too is characterized as an Oklahoma Historical Society and Association by its inclusion in Title 53.[3] The mission of the Arts Council is stated to include "arts, cultural activities and cultural heritage", and includes attention to museums, institutes and exhibits. 53 O.S.1991 § 166. This mission is similar to those statutorily recognized activities of the Historical Society.

The Legislature has provided educational television services "by and through the various educational and cultural agencies in the State of Oklahoma under the direction and supervision of the Oklahoma Educational Television Authority". 70 O.S. 1991 § 23–101. The service provided by the Television Authority is thus reasonably classified as cultural.

Historically, properties managed by the Historical Society and the Oklahoma Tourism and Recreation Department (Tourism) have had some similarities. For example, see the statutory authorization for the transfer of certain museums and property from Tourism to the Historical Society. 53 O.S.1991 § 4.1, 4.2, 4.6, and 4.8. The Tourism and Recreation Department manages lodges, parks, and recreational areas, and assists with special events of local or historical interest. 74 O.S.1991 § 1803. These parks include those in the proximity of museums such as the Cowboy Hall of Fame Park and State Capitol Park. 74 O.S.1991 §§ 1811.4, 1811.4A. Tourism also manages an area at the Cherokee Courthouse Museum, 74 O.S.1991 § 1826, and protects archaeological or anthropological sites in state parks. 74 O.S.1991 § 1828.

I view these facilities and their funding as a long-recognized, interrelated role of state government and within the Legislature's discretion for lumping together in a single bill.

Section 16 of S.B. 142 takes money appropriated to Tourism for the Quartz Mountain Summer Arts Institute, and designates it "for providing the state match to federal Bureau of Reclamation Matching Fund Program Funds." Appropriated funds do not exist "in the air", but are managed by a particular state agency and used for a particular purpose. There is no express provision in section 16 for the identity of the Department to manage, account for, and use the Matching Funds. However, if the language is read as merely redesignating Tourism funds that were to be used by that Department in one way (summer arts institute) to another way also used and managed by Tourism then I see no problem with the redesignation. The petitioners' brief does not identify a different agency for the recipient of the Matching Funds.

This brings me to my one problem with S.B. 142, Section 17. That section takes a prior appropriation to the Department of Commerce and makes the money an appropriation to Tourism. The Legislature has chosen to characterize the Department of Commerce (Commerce) as a state business regulatory agency for the purpose of funding, instead of an agency providing cultural services. The parties agree that the appropriation for Commerce is in S.B. 725, not S.B. 142. My view is that the legislature may reasonably draw lines and specify single subjects, but those lines must be consistent. While Commerce might be considered to be cultural in a certain context it cannot be so considered for funding purposes when the Legislature itself has selected to place it in a different category. Thus I agree with the majority that S.B. 142 is unconstitutional, but only on this one ground.

---

**3.** Title 53 of the Oklahoma Statutes is titled "Oklahoma Historical Societies and Associations" and Chapter 11 therein is the "Oklahoma Arts and Humanities Act" that creates the State Arts Council of Oklahoma. See 53 O.S.1991 §§ 161–172. The Oklahoma Historical Society also conducts arts and crafts programs. 53 O.S. 1991 § 1.5.

## Senate Bill 725

With regard to S.B. 725[4] the agencies are the Banking Department, Department of Commerce, Commission on Consumer Credit, Oklahoma Horse Racing Commission, State Insurance Department, Department of Labor, Liquified Petroleum Gas Board, Oklahoma Securities Commission. Here too, the parties state that appropriations were made to these agencies, and the petitioner challenges the Bill on the basis of the single-subject rule. The Legislature has identified these eight agencies as related together by a primary purpose of regulating business activities. I do not share the majority's conclusion that the Bill combines impermissible multiple subjects. The Headstart program, singled out by the majority, is one of the statutorily mandated duties of the Commerce Department in its supervisory role over Community Action Program agencies. See 74 O.S.1991 § 5035, where Commerce is designated to receive Community Services Block Grant Funds from the Federal Government. I fail to see how the appropriation to a statutorily required duty makes the Legislature's characterization of Commerce as something other than a business regulatory agency.

I believe the majority's dissatisfaction with a provision involving asbestos is also incorrect. The Department of Labor has statutory jurisdiction over regulation of asbestos, and asbestos monitoring in public as well as private buildings. 40 O.S.1991 §§ 451–455; 27A O.S.Supp.1992 § 6. The provision of S.B. 725 involving asbestos is section 30, and it provides that the Department of Labor will submit annual reports on funds received for asbestos abatement from other state agencies and projected needs for the next fiscal year, an item I find to be reasonably related to an appropriation to the Department of Labor.

## Summary

In sum, I agree S.B. 142 is unconstitutional. I concur with the majority's decision to make the Court's ruling effective June 30, 1994, and for the reasons given by the Court. I find, however, no violation of the single-subject rule in S.B. 725, as all provisions therein are germane to "state business regulatory agencies."

SIMMS, Justice, dissenting:

I dissent for the reasons expressed in my dissenting opinions in *Ethics Comm'n v. Cullison,* 850 P.2d 1069 (Okla.1992); *State ex rel. York v. Turpen,* 681 P.2d 763, 768 (Okla.1984); and *Oklahoma Ass'n of Mun. Attorneys v. State,* 577 P.2d 1310, 1315 (Okla.1978).